tially atherogenic particle distinct from low-density lipoprotein.[6] Treatment with nicotinic acid also decreases apolipoprotein B,[7] the major protein of low-density lipoprotein, decreases aggregation of platelets, and increases the blood concentration of prostacyclin, a potent vasodilator.[8] Nicotinic acid therapy decreased the 15-year total mortality in the Coronary Drug Project[9] and is the only lipid-improving drug shown to be associated with a reduced total mortality. In the Helsinki Heart Study,[10,11] treatment with gemfibrozil for 5 years resulted in a 10% decrease in total and low-density lipoprotein cholesterol levels, a 10% increase in the concentration of HDL-C, and a 26% reduction in coronary-related deaths. Coronary events were more strongly related to baseline and drug-induced alterations in HDL-C metabolism than to alterations in metabolism of low-density lipoprotein cholesterol. In the Cholesterol-Lowering Atherosclerosis Study[12] and the Familial Atherosclerosis Treatment Study,[13] combined treatment with nicotinic acid and colestipol substantially increased HDL-C and decreased low-density lipoprotein cholesterol levels; it also resulted in less progression and more regression of coronary atherosclerosis than did use of placebo, as demonstrated by serial coronary angiography.

The major limitation of nicotinic acid therapy has been bothersome side effects such as cutaneous flushing, pruritus, gastrointestinal upset, hepatotoxicity, and increased uric acid and blood glucose levels. In our experience, many of the most common side effects can be prevented by careful patient education and supervision and by using time-release rather than crystalline nicotinic acid preparations. Recently, however, we reported five cases of nicotinic acid-induced hepatitis, which occurred after administration of time-release nicotinic acid in dosages of only 1,500 to 3,000 mg/day.[14] Nicotinic acid must be used with caution, and the use of lower doses of the drug needs further investigation.

The purpose of this study was to assess the blood lipid-altering ability of low-dose (2,000 mg/day or less), time-release nicotinic acid in patients with low concentrations of HDL-C and total cholesterol levels at or below the 80th percentile for middle-aged Americans[15] in whom hygienic measures, as part of a cardiac rehabilitation-preventive cardiology program, were ineffective in increasing HDL-C to desirable levels. The assessment was accomplished by retrospectively reviewing our experience with nicotinic acid in these patients.

## SUBJECTS AND METHODS

Subjects for the study were identified retrospectively with the aid of our data base. The treatment group consisted of 55 men and 8 women who had enrolled in an outpatient cardiac rehabilitation-preventive cardiology program. For these 63 subjects, the mean age (±SD) was 55.2 ± 9.9 years, the mean weight was 83.9 ± 14.5 kg, and the mean percentage of fat in the body composition was 24.1 ± 4.5%, as determined by skinfold measurements.[15] Subjects were free from diabetes mellitus, active peptic ulcer disease, hepatic disease, gouty arthritis, and hyperuricemia. All subjects had participated for at least 3 months in exercise training, modification of diet, and patient education. Only one subject smoked during the time of the study. Although detailed smoking histories were unavailable, no other subject had smoked for at least 3 months before beginning the study. These hygienic measures were ineffective in adequately increasing HDL-C levels; all patients had the following determinations: HDL-C of less than 45 mg/dl, total cholesterol of less than 265 mg/dl, and triglycerides of less than 300 mg/dl. In 55 patients, the concentration of low-density lipoprotein cholesterol exceeded 130 mg/dl. Ancillary medications remained constant throughout the study. In 30 patients (48%), β-adrenergic blocking agents were administered. No patient received diuretics, and none of the women received estrogen. Five patients had major coronary risk factors only, and 58 had substantiated coronary artery disease (myocardial infarction, coronary artery bypass grafting, angiographic evidence of coronary disease, or some combination of these factors).

In no subject did time-release nicotinic acid cause intolerable side effects. Time-release nicotinic acid (either Slo-Niacin or a generic equivalent) was administered in a divided dosage of 2,000 mg/day or less. The initial regimen was 100 to 500 mg twice daily (at mealtime), and the dosage was progressively increased by the physician responsible for management of the individual patient's blood lipids. Occasionally, patients were instructed to take one aspirin tablet 30 minutes before each dose of nicotinic acid to decrease cutaneous flushing. Every 3 months, blood lipids and blood chemistry profiles were determined, and the drug dosage and blood lipid-altering effects were reviewed. Blood specimens from the subjects were analyzed in a Mayo Clinic medical laboratory. In venous blood specimens obtained after an overnight 12-hour fast, serum lipids were measured with use of the following techniques: cholesterol and triglycerides were determined by enzymatic methods, HDL-C was isolated by dextran precipitation, and low-density lipoprotein cholesterol was calculated with use of the Friedewald formula.[16] Blood glucose during fasting, uric acid, and aspartate aminotransferase were measured by using standard techniques before and after nicotinic acid treatment. A single blood lipid profile from each subject was compared before and after the study.

A sample of 54 patients, similar in composition to the treatment group (47 men and 7 women; mean age, 61.5 ± 10.4 years; mean weight, 79.9 ± 14.2 kg; body fat, 24.5 ± 5.2%), was identified in the data base. These patients participated in the study for a mean of 8.3 ± 1.3 months and

were not treated with lipid-improving drugs (control group). All patients in the control group had coronary artery disease, took medications similar to those taken by the treatment group (approximately 50% received β-blocking agents), and had blood lipids within the guidelines previously reported for inclusion in the study. They had also participated in 3 months of diet and exercise therapy (the same cardiac rehabilitation-preventive cardiology program as the treatment subjects) before the start of the study. Patients were not randomized to their respective groups. Statistical comparisons of blood lipids and blood chemistry variables before and after nicotinic acid therapy in the treatment group as well as comparisons of the change in blood lipids between the treatment and control groups were made by using the $t$ test. $P$ values of less than 0.05 were considered significant.

## RESULTS

The mean dose of nicotinic acid was 1,297 ± 597 mg/day, and the mean duration of treatment was 7.4 ± 4.1 months. Although diet and exercise histories were not completed by the subjects, analysis of the physician- and dietitian-recorded progress notes for each patient indicated that the subjects in both the treatment group and the control group did not substantially alter diet (including intake of alcohol) or exercise habits during the study. Mean body weight did not change during the study (84 ± 15 kg versus 83 ± 14 kg for the treatment group; 80 ± 14 kg versus 81 ± 15 kg for the control group). Medications, other than nicotinic acid, remained unchanged during the treatment period.

As shown in Table 1, blood lipid variables, on the average, improved with nicotinic acid therapy in the treatment group. HDL-C levels increased by a mean of 18% (+6 mg/dl). A wide intersubject variability in response to nicotinic acid therapy was evident; the changes in HDL-C ranged from −5 to +35 mg/dl. Nine subjects (14%) had no improvement in HDL-C or other blood lipid variables. The nonresponders had a baseline mean triglyceride level of 195 mg/dl (range, 72 to 248 mg/dl) and a mean HDL-C level of 34 mg/dl (range, 25 to 41 mg/dl). The mean total cholesterol concentration decreased 9% (−20 mg/dl), and the ratio of total cholesterol to HDL-C was reduced by 25% (from 6.8 to 5.1). The mean triglyceride level decreased 20% (−33 mg/dl), and calculated low-density lipoprotein cholesterol was reduced by 13% (−20 mg/dl). The dose of nicotinic acid was not significantly correlated ($P$ = NS) with the change in HDL-C ($r$ = −0.07) and was only weakly related to the change in total cholesterol ($r$ = 0.2; $P$ = 0.05). The dose range of nicotinic acid used, however, was narrow (45 subjects took either 1,000 or 1,500 mg/day).

Patients in the control group had lower levels of total cholesterol, low-density lipoprotein cholesterol, and total triglycerides and lower ratios of total cholesterol to HDL-C than did those in the treatment group (Table 1). The control subjects did not receive nicotinic acid. Baseline HDL-C concentrations were comparable in the two groups. Hygienic measures to improve blood lipids in the control group resulted in a small significant increase in HDL-C concentration but no significant change in the other blood lipid variables (Table 1). The treatment group experienced a greater reduction in triglycerides than did the control group, although the difference between groups was not significant. All other changes in blood lipids were significantly different between groups. Baseline triglyceride levels did not correlate with the change in HDL-C level for either the treatment group ($r$ = −0.2; $P$ = NS) or the control group ($r$ = 0.0; $P$ = NS). For subjects in the treatment group who had baseline triglyceride concentrations of less than 150 mg/dl, the mean increase in HDL-C level was 8 mg/dl. For patients in the treatment group who had baseline triglyceride levels that exceeded 150 mg/dl, the HDL-C concentration increased 5

Table 1.—**Blood Lipid Variables Before and After Nicotinic Acid Therapy in the Treatment Group and After Hygienic Measures Only in the Control Group***

| | Treatment group (N = 63) | | | Control group (N = 54) | | |
|---|---|---|---|---|---|---|
| Variable | Before | After | Difference | Before | After | Difference |
| Total-C (mg/dl) | 223 ± 25† | 203 ± 29‡ | −20 ± 30† | 192 ± 28 | 200 ± 59 | +8 ± 53 |
| HDL-C (mg/dl) | 34 ± 5 | 40 ± 9‡ | +6 ± 8† | 36 ± 6 | 39 ± 8‡ | +3 ± 6 |
| Total-C/HDL-C ratio | 6.8 ± 1.2† | 5.1 ± 1.3‡ | −2 ± 1† | 5.5 ± 1.1 | 5.1 ± 1.4 | 0 ± 1 |
| LDL-C (mg/dl) | 157 ± 25† | 137 ± 28‡ | −20 ± 26† | 128 ± 25 | 135 ± 54 | +7 ± 26 |
| TG (mg/dl) | 165 ± 69† | 132 ± 47‡ | −33 ± 57 | 145 ± 57 | 130 ± 54 | −15 ± 56 |

*Values are shown as means ± SD. HDL-C = high-density lipoprotein cholesterol; LDL-C = low-density lipoprotein cholesterol; TG = total triglycerides; total-C = total cholesterol. See text for further characterization of subjects.
†$P$<0.01 treatment versus control groups.
‡$P$<0.01 after versus before.

mg/dl. (HDL-C increases for triglyceride levels less than 150 mg/dl versus values more than 150 mg/dl were not significantly different.) The change in triglyceride levels was unrelated to the change in HDL-C concentrations ($r = -0.1$ for treated subjects; $r = -0.1$ for control subjects; $P =$ NS). Furthermore, no significant relationship was found between baseline body weight and the change in HDL-C level ($r = 0.05$; $P =$ NS).

Evidence of drug intolerance or toxicity could not be assessed in the treatment group because the nonrandomized retrospective design of the study would have excluded patients who did not tolerate nicotinic acid clinically. The group means for blood glucose during fasting, aspartate aminotransferase, and uric acid concentrations before and after nicotinic acid treatment are shown in Table 2. Aspartate aminotransferase and uric acid concentrations were minimally increased after treatment, but these changes were not sufficiently significant clinically to discontinue nicotinic acid therapy. No significant change was noted in the blood glucose concentration.

## DISCUSSION

According to the National Cholesterol Education Program guidelines,[17] the minimal recommended therapeutic dose for nicotinic acid is 1,500 mg/day. The major finding in the current investigation was that doses of time-release nicotinic acid between 200 and 2,000 mg/day (mean, 1,297 mg/day) resulted in moderate, significant increases in the HDL-C level and beneficial effects on all other blood lipid variables that were measured. This result occurred in the setting of a structured cardiac rehabilitation-preventive cardiology program in which a 3-month or longer trial of exercise training, low-fat and low-cholesterol diet, and weight control was ineffective in normalizing the HDL-C level.

Several limitations of the current study should be addressed. The investigation was nonrandomized and retrospective. The baseline blood lipid profile of the control group was more favorable than that of the treatment group. In particular, baseline triglyceride levels were lower in the control group, although this factor did not account for the changes in HDL-C level. Inclusion of the control group allowed separation, at least partially, of the effects of nicotinic acid treatment on the blood lipid profile from the effects of continued diet and aerobic exercise. As the study progressed, the subjects in both groups would be expected to reduce dietary and exercise compliance. Furthermore, repeated measurements of blood lipids may change in both groups because of the phenomenon of regression to the mean. Thus, inclusion of the control group was an important aspect of the study design. A randomized and controlled trial is necessary to study the relationship between nicotinic acid therapy and HDL-C levels thoroughly. Of interest, mean body weight did not decrease in either group as a result of continued diet and exercise, although no attempt was made to balance caloric intake and expenditure to maintain body weight. On the average, however, subjects were not severely overweight. In the treatment group, the compliance of the subjects in taking nicotinic acid was not objectively assessed, but the mild increases in aspartate aminotransferase and uric acid suggest that the patients did take the drug.

In previous investigations of the effect of nicotinic acid on HDL-C level, larger doses of the drug have usually been administered. Shepherd and associates,[18] who administered 3,000 mg/day of crystalline nicotinic acid to five healthy subjects with normal levels of blood lipids, found a 23% increase in HDL-C concentration (from 52 mg/dl to 64 mg/dl). The total cholesterol level decreased 15% (from 163 mg/dl to 139 mg/dl), and the apolipoprotein A-I concentration increased 7%. A study more comparable to the current one was reported by Alderman and colleagues,[19] who enrolled 101 patients with coronary artery disease in a 1-year

Table 2.—**Fasting Blood Glucose, Aspartate Aminotransferase, and Uric Acid Concentrations Before and After Nicotinic Acid Therapy in 63 Subjects (Treatment Group)***

| Variable | Normal range | Before treatment† | After treatment† | *P* |
|---|---|---|---|---|
| Fasting blood glucose (mg/dl) | 70-100 | 99 ± 21 | 101 ± 18 | NS |
| Aspartate aminotransferase (U/liter) | 12-31 | 24 ± 13 | 29 ± 21 | 0.01 |
| Uric acid (mg/dl) | M: 4.3-8.0<br>W: 2.3-6.0 | 6.7 ± 1.3 | 7.0 ± 1.4 | 0.02 |

*M = men; NS = not significant; W = women. See text for further characterization of subjects.
†Means ± SD.

investigation of the blood lipid-altering effects of either crystalline or time-release nicotinic acid (1,415 ± 698 mg/day). Exercise and diet were not addressed. The HDL-C level increased 31% (from 36 mg/dl to 47 mg/dl), and the total cholesterol level decreased 13% (from 246 mg/dl to 213 mg/dl). Unlike the current study, 19 of the subjects experienced clinically important increases in liver enzymes. An even lower dose of time-release nicotinic acid (1,000 mg/day) was studied by Luria[20] in a sample of 32 coronary patients with mean baseline levels of 39 mg/dl for HDL-C and 232 mg/dl for total cholesterol. The HDL-C concentration was increased by a mean of 28% (to 50 mg/dl), but the total cholesterol level was unchanged by the treatment. Of the 55 subjects who began the study, 40% discontinued participation because of adverse reactions to the nicotinic acid.

Although no clinical trial has addressed the efficacy of drug therapy for increasing low concentrations of HDL-C,[21] we felt justified in using nicotinic acid in these patients. A large body of epidemiologic, clinical trial, and angiographic evidence indicates the clinical importance of low HDL-C. In the current study, 55 of the 63 subjects in the treatment group had low-density lipoprotein cholesterol concentrations that exceeded 130 mg/dl. The National Cholesterol Education Program guidelines recommend treatment for this level of low-density lipoprotein cholesterol in patients with coronary artery disease and advise selection of an agent that will not only decrease low-density lipoprotein cholesterol levels but also increase HDL-C in this circumstance.[17]

The current study and previous investigations show that relatively modest doses of nicotinic acid can increase HDL-C levels. The magnitude of the increases in HDL-C level relative to the dose of nicotinic acid administered varied among the studies. The use of different nicotinic acid preparations may account for some of the variability in response. In our study, we noted a large variation in the individual subject's responses to time-release nicotinic acid in increasing the HDL-C concentration. Approximately 14% of subjects had no improvement in HDL-C level (including five patients who had a decrease of 5 mg/dl or less), whereas four subjects had increases in HDL-C levels of 20 mg/dl or more. An explanation for this considerable variability in response to nicotinic acid is not apparent. During the period of observation, smoking status, exercise, and dietary habits were stable. Triglyceride levels correlate inversely with HDL-C levels.[21] In the current study, no relationship between baseline triglyceride levels or the change in triglycerides and the change in HDL-C concentrations was found, although the range of triglyceride levels was narrow (68% of subjects in the treatment group had levels between 105 and 225 mg/dl).

Drugs other than nicotinic acid can increase the HDL-C level. Vega and Grundy[22] treated 22 subjects with lower than optimal levels of HDL-C (mean, 29 mg/dl) and normal total cholesterol concentrations (mean, 195 mg/dl) with either lovastatin (20 mg/day) or gemfibrozil (1,200 mg/day). All subjects were nonsmokers, and the protocol included a step 1 low-fat and low-cholesterol diet. The HDL-C level increased approximately 10% with use of either drug, although lovastatin decreased total cholesterol concentrations to a greater degree than did gemfibrozil. The diet contained polyunsaturated fat as the major lipid nutrient, a factor that may explain why the HDL-C level was only moderately increased by the drugs. Results from the current study and from previous investigations suggest that nicotinic acid has a greater potential for augmentation of HDL-C concentrations than either lovastatin or gemfibrozil.

Time-release nicotinic acid preparations seem to be more hepatotoxic than crystalline forms of the drug. Henkin and co-workers[23] described three patients in whom hepatitis developed after use of time-release nicotinic acid but who tolerated rechallenges with crystalline nicotinic acid at equivalent or higher doses of the drug. We recently reported hepatotoxicity in five patients given 3,000 mg/day or less of time-release nicotinic acid.[14] In our extensive clinical experience with time-release nicotinic acid, periodic monitoring of liver enzymes has revealed that serious hepatotoxicity is uncommon, and we continue to recommend its use for the treatment of hyperlipidemia in selected patients. At low doses, in our experience, time-release nicotinic acid is usually better tolerated than the crystalline form. We recommend a starting dosage of 1,000 mg/day or less, a gradual increase in dose as needed, and a maximal dosage of 3,000 mg/day.

In the current study, subjects were selected retrospectively during nicotinic acid therapy. Therefore, patients' tolerance of nicotinic acid cannot be assessed.

## CONCLUSION

Time-release nicotinic acid is an excellent, inexpensive blood lipid-improving agent. Treatment with low-dose, time-release nicotinic acid results in significant improvement in HDL-C concentrations and in the entire blood lipid profile in selected patients who have depressed HDL-C levels and total cholesterol concentrations at or less than the 80th percentile.

## REFERENCES


1. Kannel WB: High-density lipoproteins: epidemiologic profile and risks of coronary artery disease. Am J Cardiol 52:9B-12B, 1983
2. Gordon DJ, Probstfield JL, Garrison RJ, Neaton JD, Castelli WP, Knoke JD, Jacobs DR Jr, Bangdiwala S, Tyroler HA: High-density lipoprotein cholesterol and cardiovascular disease: four prospective American studies. Circulation 79:8-15, 1989

3. Campeau L, Enjalbert M, Lespérance J, Bourassa MG, Kwiterovich P Jr, Wacholder S, Sniderman A: The relation of risk factors to the development of atherosclerosis in saphenous-vein bypass grafts and the progression of disease in the native circulation: a study 10 years after aortocoronary bypass surgery. N Engl J Med 311:1329-1332, 1984
4. Gordon DJ, Rifkind BM: High-density lipoprotein—the clinical implications of recent studies. N Engl J Med 321:1311-1316, 1989
5. Lavie CJ, O'Keefe JH, Blonde L, Gau GT: High-density lipoprotein cholesterol: recommendations for routine testing and treatment. Postgrad Med 87:36-44; 47; 51, May 1990
6. Gurakar A, Hoeg JM, Kostner G, Papadopoulos NM, Brewer HB Jr: Levels of lipoprotein Lp(a) decline with neomycin and niacin treatment. Atherosclerosis 57:293-301, 1985
7. Wahlberg G, Holmquist L, Walldius G, Annuzzi G: Effects of nicotinic acid on concentrations of serum apolipoproteins B, C-I, C-II, C-III and E in hyperlipidemic patients. Acta Med Scand 224:319-327, 1988
8. Walldius G, Wahlberg G: Effects of nicotinic acid and its derivatives on lipid metabolism and other metabolic factors related to atherosclerosis. Adv Exp Med Biol 183:281-293, 1985
9. Canner PL, Berge KG, Wenger NK, Stamler J, Friedman L, Prineas RJ, Friedewald W (for the Coronary Drug Project Research Group): Fifteen year mortality in Coronary Drug Project patients: long-term benefit with niacin. J Am Coll Cardiol 8:1245-1255, 1986
10. Frick MH, Elo O, Haapa K, Heinonen OP, Heinsalmi P, Helo P, Huttunen JK, Kaitaniemi P, Koskinen P, Manninen V, Mäenpää H, Mälkönen M, Mänttäri M, Norola S, Pasternack A, Pikkarainen J, Romo M, Sjöblom T, Nikkilä EA: Helsinki Heart Study: primary-prevention trial with gemfibrozil in middle-aged men with dyslipidemia; safety of treatment, changes in risk factors, and incidence of coronary heart disease. N Engl J Med 317:1237-1245, 1987
11. Manninen V, Elo MO, Frick MH, Haapa K, Heinonen OP, Heinsalmi P, Helo P, Huttunen JK, Kaitaniemi P, Koskinen P, Mäenpää H, Mälkönen M, Mänttäri M, Norola S, Pasternack A, Pikkarainen J, Romo M, Sjöblom T, Nikkilä EA: Lipid alterations and decline in the incidence of coronary heart disease in the Helsinki Heart Study. JAMA 260:641-651, 1988
12. Blankenhorn DH, Nessim SA, Johnson RL, Sanmarco ME, Azen SP, Cashin-Hemphill L: Beneficial effects of combined colestipol-niacin therapy on coronary atherosclerosis and coronary venous bypass grafts. JAMA 257:3233-3240, 1987
13. Brown G, Albers JJ, Fisher LD, Schaefer SM, Lin J-T, Kaplan C, Zhao X-Q, Bisson BD, Fitzpatrick VF, Dodge HT: Regression of coronary artery disease as a result of intensive lipid-lowering therapy in men with high levels of apolipoprotein B. N Engl J Med 323:1289-1298, 1990
14. Etchason JA, Miller TD, Squires RW, Allison TG, Gau GT, Marttila JK, Kottke BA: Niacin-induced hepatitis: a potential side effect with low-dose time-release niacin. Mayo Clin Proc 66:23-28, 1991
15. Pollock ML, Wilmore JH: Exercise in Health and Disease: Evaluation and Prescription for Prevention and Rehabilitation. Second edition. Philadelphia, WB Saunders Company, 1990
16. Friedewald WT, Levy RI, Fredrickson DS: Estimation of the concentration of low-density lipoprotein cholesterol in plasma, without use of the preparative ultracentrifuge. Clin Chem 18:499-502, 1972
17. National Heart, Lung, and Blood Institute: Report of the National Cholesterol Education Program: Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol Levels in Adults. Arch Intern Med 148:36-69, 1988
18. Shepherd J, Packard CJ, Patsch JR, Gotto AM Jr, Taunton OD: Effects of nicotinic acid therapy on plasma high density lipoprotein subfraction distribution and composition and on apolipoprotein A metabolism. J Clin Invest 63:858-867, 1979
19. Alderman JD, Pasternak RC, Sacks FM, Smith HS, Monrad ES, Grossman W: Effect of a modified, well-tolerated niacin regimen on serum total cholesterol, high density lipoprotein cholesterol and the cholesterol to high density lipoprotein ratio. Am J Cardiol 64:725-729, 1989
20. Luria MH: Effect of low-dose niacin on high-density lipoprotein cholesterol and total cholesterol/high-density lipoprotein cholesterol ratio. Arch Intern Med 148:2493-2495, 1988
21. Grundy SM: Cholesterol and coronary heart disease: future directions. JAMA 264:3053-3059, 1990
22. Vega GL, Grundy SM: Comparison of lovastatin and gemfibrozil in normolipidemic patients with hypoalphalipoproteinemia. JAMA 262:3148-3153, 1989
23. Henkin Y, Johnson KC, Segrest JP: Rechallenge with crystalline niacin after drug-induced hepatitis from sustained-release niacin. JAMA 264:241-243, 1990

REDACTED

Biom
QV 772
P5 785
46th
1992

# PDR® 46 EDITION 1992

# PHYSICIANS' DESK REFERENCE®

**Director of Production:**
MARJORIE A. DUFFY

**Assistant Director of Production:**
CARRIE WILLIAMS

**Manager of Production Services:**
ELIZABETH H. CARUSO

**Format Editor:**
MILDRED M. SCHUMACHER

**Production Coordinator:**
ELIZABETH A. KARST

**Art Associate:**
JOAN K. AKERLIND

**Medical Consultant:**
LOUIS V. NAPOLITANO, MD

**Product Manager:**
JOHN A. MALCZYNSKI

**Sales Manager:**
CHARLIE J. MEITNER

**Account Managers:**
CHAD E. ALCORN
MICHAEL S. SARAJIAN
JOANNE C. TERZIDES

**Commercial Sales Manager:**
ROBIN B. BARTLETT

**Direct Marketing Manager:**
ROBERT W. CHAPMAN

**Manager, Professional Data:**
MUKESH MEHTA, R.Ph.

**Index Editor:**
ADELE L. DOWD

Copyright © 1992 and published by Medical Economics Data, a division of Medical Economics Company Inc., at Montvale, N.J. 07645. All rights reserved. None of the content of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means (electronic, mechanical, photocopying, or otherwise) without the prior written permission of the publisher. PHYSICIANS' DESK REFERENCE®, PDR®, PDR For Ophthalmology®, PDR For Nonprescription Drugs®, PDR Drug Interactions and Side Effects® and PDR Indications Index™ are trademarks of Medical Economics Company Inc., registered in the United States Patent and Trademark Office.

Officers of Medical Economics Data, a division of Medical Economics Company Inc.: President and Chief Executive Officer: Norman R. Snesil; Senior Vice President and Chief Financial Officer: Joseph T. Deithorn; Senior Vice President of Business Development, Stephen J. Sorkenn; Senior Vice President of Operations: Mark L. Weinstein; Vice President, Sales and Marketing: Thomas F. Rice; Vice President of Circulation: Scott I. Rockman; Vice President of Information Services: Edward J. Zecchini.

ISBN 1-56363-003-6

## Rhône-Poulenc Rorer—Cont.

**NICOBID® Tempules®** OTC
**(niacin)**
**TIMED-RELEASE NICOTINIC ACID SUPPLEMENT**

### DESCRIPTION

Each black-and-clear Tempule® (timed-release capsule) contains 125 mg niacin (nicotinic acid); each green-and-clear Tempule (timed-release capsule) contains 250 mg niacin (nicotinic acid); and each opaque blue and white Tempule (timed-release capsule) contains 500 mg niacin (nicotinic acid). Nicobid® Tempules® provide the full actions of niacin (nicotinic acid). Portions of the pellets contained in the Tempule are released immediately. The remainder is released over several hours.

### INDICATIONS AND USAGE

Nicobid (niacin) is used in all those conditions in which niacin (nicotinic acid) supplementation is indicated. It has the advantage of a slower release of niacin (nicotinic acid) than conventional tablet dosage forms. This may permit its use by those who do not tolerate the tablets.

### PRECAUTIONS

Nicobid should not be used by persons with a known sensitivity to niacin (nicotinic acid) and by persons with heart or gallbladder disease, gout, arterial bleeding, glaucoma, diabetes, impaired liver function, peptic ulcer, or by pregnant women. Patients taking antihypertensive drugs should consult a physician before taking Nicobid. Abnormal liver function tests have been reported in patients taking daily doses of 500 mg and above of timed-release niacin. Patients should consult their doctor before using daily doses of 500 mg or more of timed-release niacin.

### ADVERSE REACTIONS

Temporary flushing and feeling of warmth may be expected. These seldom reach levels so as to necessitate discontinuance. If these symptoms persist, discontinue use and consult a physician. Temporary headache, itching and tingling, gastric disturbances, skin rash, allergies, and impaired liver function may occur.

### DOSAGE

**Usual Adult Dose:**
*125 mg and 250 mg Tempules*—one Tempule morning and evening.
*500 mg Tempules*—one Tempule in the morning *or* evening.
Before using or exceeding 500 mg daily, consult a physician.
NOTE: See PRECAUTIONS.
**KEEP OUT OF THE REACH OF CHILDREN**
Revised: 7/91
**RHÔNE-POULENC RORER PHARMACEUTICALS INC.**
Collegeville, PA, U.S.A. 19426-2911
*Shown in Product Identification Section, page 427*

**NICOLAR®** ℞
*[nic'ō-lär"]*
**(niacin tablets)**

### DESCRIPTION

Nicolar® (niacin tablets) is a scored yellow-colored tablet containing 500 mg of niacin (nicotinic acid).
The tablets also contain microcrystalline cellulose, FD&C yellow No. 5 (tartrazine) (see PRECAUTIONS), magnesium stearate, povidone, and colloidal silica.

### ACTIONS

Niacin functions in the body as a component of two hydrogen transporting coenzymes: Coenzyme I (Nicotinamide Adenine Dinucleotide [NAD], sometimes called Diphosphopyridine Nucleotide [DPN]) and Coenzyme II (Nicotinamide Adenine Dinucleotide Phosphate [NADP], sometimes called Triphosphopyridine Nucleotide [TPN]). Niacin, in addition to its functions as a vitamin, exerts several distinctive pharmacologic effects which vary according to the dosage level employed.
Niacin, in large doses, causes a reduction in serum lipids. The exact mechanism of this action is unknown.

### INDICATIONS

Since no drug is innocuous, strict attention should be paid to the indications and contraindications, particularly when selecting drugs for long-term use.
Nicolar® (niacin tablets) is indicated as adjunctive therapy in patients with significant hyperlipidemia (elevated cholesterol and/or triglycerides) who do not respond adequately to diet and weight loss.
*Notice: It has not been established whether the drug-induced lowering of serum cholesterol or triglyceride levels has a beneficial effect, no effect, or a detrimental effect on the morbidity or mortality due to atherosclerosis including coronary heart disease. Investigations now in progress may yield an answer to this question.*

### CONTRAINDICATIONS

Niacin is contraindicated in patients with a known idiosyncrasy to niacin, with hepatic dysfunction, with active peptic ulcer or with arterial bleeding.

### WARNINGS

Use of this drug in pregnancy, lactation or in women of child-bearing age requires that the potential benefits of the drug be weighed against its possible hazards to the mother and child. Although fetal abnormalities have not been reported with this drug, its use as an antilipidemic agent requires high dosages, and animal reproduction or teratology studies have not been done. There are insufficient studies done for usage in children.
Keep out of reach of children.

### PRECAUTIONS

Great caution must be exercised when niacin is used in patients with coronary disease or gallbladder disease. Patients with a past history of jaundice, liver disease or peptic ulcer should be observed closely while taking the medication. Frequent monitoring of liver function tests and blood glucose should be performed during therapy to ascertain that the drug has no adverse effects on these organ systems.
Antihypertensive drugs of the adrenergic-blocking type may have an additive vasodilating effect and produce postural hypotension.
Elevated uric acid levels have occurred, therefore use with caution in patients predisposed to gout.
Drug Interactions: Antihypertensive drugs may have an additive vasodilating effect and produce postural hypotension.
Diabetic or potential diabetic patients should be observed closely in the event of decreased glucose tolerance. Adjustment of diet and/or hypoglycemic therapy may be necessary.
This product contains FD&C Yellow No. 5 (tartrazine) which may cause allergic-type reactions (including bronchial asthma) in certain susceptible persons. Although the overall incidence of FD&C Yellow No. 5 (tartrazine) sensitivity in the general population is low, it is frequently seen in patients who also have aspirin hypersensitivity.

### ADVERSE REACTIONS

Atrial fibrillation and other cardiac arrhythmias
Severe generalized flushing
Decreased glucose tolerance
Activation of peptic ulcers
Abnormalities of hepatic functional tests
Jaundice
Gastrointestinal disorders
Dryness of the skin
Acanthosis Nigricans
Pruritus
Hyperuricemia
Toxic amblyopia
Hypotension
Transient headache

### OVERDOSAGE

High doses of nicotinic acid may produce temporary flushing, pruritus, and gastrointestinal distress.

### DOSAGE AND ADMINISTRATION

Usually Recommended Adult Dosage—1 to 2 grams three times a day. The dosage must be adjusted to the response of the patient.
Start with two tablets (1 g) three times a day with food or after meals, taken with cold liquids, if necessary, to facilitate swallowing. Since low doses may control hyperlipidemia in some patients, the dosage should be individualized according to the effect on serum lipid levels. If the plasma cholesterol and/or triglyceride level does not show a decrease after a reasonable time at this dosage, an increase in dosage may be considered but requires careful titration and observation of the patient for unwanted effects. The dosage may be increased every 2 to 4 weeks, but in no case should the dosage exceed 6 grams/day.
Since flushing, pruritus and gastrointestinal distress appear frequently and tend to be dose-related, increase the dosage gradually in increments of 500 mg (1 tablet) while carefully observing the patient and monitoring the plasma cholesterol and/or triglyceride level for therapeutic response and for adverse effects.
Where the observed adverse reactions or potential hazards exceed the benefits of use, dosage should be reduced to the minimum recommended dosage and, where necessary, discontinued entirely.

### HOW SUPPLIED

Nicolar® (niacin tablets) is available in bottles of 100 scored tablets, (NDC 0075-2850-01). Each tablet contains 500 mg of nicotinic acid (identified by the code NE).
Dispense in a tight container as defined in the USP. Store at controlled room temperature, 59°–86°F (15°–30°C).
**Caution:** Federal (U.S.A.) law prohibits dispensing without prescription.
Rev. 5/88
**RHÔNE-POULENC RORER PHARMACEUTICALS INC.**
Collegeville, PA, U.S.A. 19426-2911
*Shown in Product Identification Section, page 427*

**NITROLINGUAL® SPRAY** ℞
**(nitroglycerin lingual aerosol)**
**0.4 mg/metered dose**

### PRODUCT OVERVIEW

### KEY FACTS

Nitrolingual® Spray is a metered-dose aerosol containing 200 doses of nitroglycerin. Each metered dose of Nitrolingual Spray delivers 0.4 mg of nitroglycerin per actuation. Nitrolingual Spray offers guaranteed potency for 3 years from date of manufacture.

### MAJOR USES

Nitrolingual® Spray is indicated for acute relief of an attack or prophylaxis of angina pectoris due to coronary artery disease.

### SAFETY INFORMATION

Nitrolingual® Spray is contraindicated in patients who have shown purported hypersensitivity or idiosyncrasy to it or to other nitrates or nitrites.
NOTE: THE SPRAY SHOULD NOT BE INHALED.

### PRESCRIBING INFORMATION

**NITROLINGUAL® SPRAY** ℞
**(nitroglycerin lingual aerosol)**
**0.4 mg/metered dose**

### DESCRIPTION

Nitroglycerin, an organic nitrate, is a vasodilator which has effects on both arteries and veins. The chemical name for nitroglycerin is 1,2,3-propanetriol trinitrate ($C_3H_5N_3O_9$). The compound has a molecular weight of 227.09. The chemical structure is:

$CH_2-ONO_2$
$CH-ONO_2$
$CH_2-ONO_2$

Nitrolingual Spray (nitroglycerin lingual aerosol 0.4 mg) is a metered dose aerosol containing nitroglycerin in propellants (dichlorodifluoromethane and dichlorotetrafluoroethane). Each metered dose of Nitrolingual Spray delivers 0.4 mg of nitroglycerin per spray emission. This product delivers nitroglycerin in the form of spray droplets onto or under the tongue. Inactive ingredients: caprylic/capric/diglyceryl succinate, ether, flavors.

### CLINICAL PHARMACOLOGY

The principal pharmacological action of nitroglycerin is relaxation of vascular smooth muscle, producing a vasodilator effect on both peripheral arteries and veins with more prominent effects on the latter. Dilation of the post-capillary vessels, including large veins, promotes peripheral pooling of blood and decreases venous return to the heart, thereby reducing left ventricular end-diastolic pressure (preload). Arteriolar relaxation reduces systemic vascular resistance and arterial pressure (after-load).
The mechanism by which nitroglycerin relieves angina pectoris is not fully understood. Myocardial oxygen consumption or demand (as measured by the pressure-rate product, tension-time index, and stroke-work index) is decreased by both the arterial and venous effects of nitroglycerin and presumably, a more favorable supply-demand ratio is achieved. While the large epicardial coronary arteries are also dilated by nitroglycerin, the extent to which this action contributes to relief of exertional angina is unclear.
Nitroglycerin is rapidly metabolized *in vivo*, with a liver reductase enzyme having primary importance in the formation of glycerol nitrate metabolites and inorganic nitrate. Two active major metabolites, 1, 2- and 1,3-dinitroglycerols, the products of hydrolysis, although less potent as vasodilators, have longer plasma half-lives than the parent compound. The dinitrates are further metabolized to mononitrates (considered biologically inactive with respect to cardiovascular effects) and ultimately glycerol and carbon dioxide.
Therapeutic doses of nitroglycerin may reduce systolic, diastolic, and mean arterial blood pressure. Effective coronary perfusion pressure is usually maintained, but can be compromised if blood pressure falls excessively or increased heart rate decreases diastolic filling time.
Elevated central venous and pulmonary capillary wedge pressures, pulmonary vascular resistance and systemic vascular resistance are also reduced by nitroglycerin therapy. Heart rate is usually slightly increased, presumably a reflex response to the fall in blood pressure. Cardiac index may be increased, decreased, or unchanged. Patients with elevated left ventricular filling pressure and systemic vascular resis-

**Upsher-Smith—Cont.**

in the range of 20 mEq per day. Doses of 40–100 mEq per day or more are used for the treatment of potassium depletion. Dosage should be divided if more than 20 mEq per day is given such that no more than 20 mEq is given in a single dose.
Each Klor-Con® Extended-release Tablet provides 8 mEq or 10 mEq of potassium chloride.
Klor-Con® Extended-release Tablets should be taken with meals and with a glass of water or other liquid. This product should not be taken on an empty stomach because of its potential for gastric irritation (see WARNINGS).
NOTE: Klor-Con® Extended-release Tablets must be swallowed whole. Take each dose without crushing, chewing or sucking the tablets.

**HOW SUPPLIED**

Film coated, Klor-Con® 8 (blue), Klor-Con® 10 (yellow), imprinted round tablets containing:

600 mg potassium chloride (equivalent to 8 mEq) in bottles of 100 (NDC 0245-0040-11), bottles of 500 (NDC 0245-0040-15), and unit-dose packages of 100 (NDC 0245-0040-01);
750 mg potassium chloride (equivalent to 10 mEq) in bottles of 100 (NDC 0245-0041-11), bottles of 500 (NDC 0245-0041-15), and unit-dose packages of 100 (NDC 0245-0041-01).

Protect from light and moisture. Store at controlled room temperature 59°–86°F (15°–30°C). Dispense in container with child resistant closure.
CAUTION: Federal law prohibits dispensing without prescription.

*Shown in Product Identification Section, page 433*

**KLOR-CON®/EF 25mEq** ℞
*[klōr 'kon]*
**Potassium Bicarbonate Effervescent Tablets for Oral Solution, USP**

**DESCRIPTION**

Each effervescent tablet in solution provides 25 mEq (978 mg) potassium as bicarbonate and citrate. KLOR-CON®/EF tablets are sugar free and orange flavored.

**HOW SUPPLIED**

KLOR-CON®/EF 25 mEq effervescent tablets in cartons of 30 and 100 individually wrapped tablets.
30's NDC 0245-0039-30, 100's NDC 0245-0039-01

**LUBRIN® Vaginal Lubricating Inserts** OTC
*[lu 'brin]*

**DESCRIPTION**

Vaginal dryness can occur due to a variety of reasons including: menopause, stress, medication use, side effects from cancer treatment, or even after the use of a tampon. Lubrin® Inserts are the first premeasured, easy-to-use inserts specifically designed for vaginal dryness. Lubrin® Inserts are unscented, colorless, water-soluble inserts that provide long lasting lubrication. Lubrin® Inserts quickly liquefy within the vagina to simulate natural lubrication for several hours.

**HOW SUPPLIED**

Lubrin® Inserts are available in packages of five and twelve inserts.
5's List No.: 0245-0118-19, 12's List No.: 0245-0118-12.

**NIACOR®** ℞
*[nī 'akor]*
**Niacin Tablets, 500 mg**

**DESCRIPTION**

Niacor® Niacin Tablets are white scored tablets with "NIACOR" imprinted on one side, containing 500 mg of niacin (nicotinic acid). The structure is shown below. The tablets also contain acacia, corn starch, lactose anhydrous, magnesium stearate, methanol, P.V.P., stearic acid and water.




**CLINICAL PHARMACOLOGY**

Niacin functions in the body as a component of two hydrogen transporting coenzymes: Coenzyme I (Nicotinamide Adenine Dinucleotide [NAD], sometimes called Diphosphopyridine Nucleotide [DPN]) and Coenzyme II (Nicotinamide Adenine Dinucleotide Phosphate [NADP], sometimes called Triphosphopyridine Nucleotide [TPN]). Niacin, in addition to its functions as a vitamin, exerts several distinctive pharmacological effects which vary according to the dosage level employed. Niacin, in large doses, causes a reduction in serum lipids. The exact mechanism of this action is unknown.

**INDICATIONS**

Since no drug is innocuous, strict attention should be paid to the indications and contraindications, particularly when selecting drugs for long term use. Niacor® Niacin Tablets are indicated as adjunctive therapy in patients with significant hyperlipidemia (elevated cholesterol and/or triglycerides) who do not respond adequately to diet and weight loss.
Notice: It has not been established whether the drug-induced lowering of serum cholesterol or triglyceride levels has a beneficial effect, no effect, or a detrimental effect on the morbidity or mortality due to atherosclerosis including coronary heart disease. Investigations now in progress may yield an answer to this question.

**CONTRANDICATIONS**

Niacor® Niacin Tablets are contraindicated in patients with a known idiosyncrasy to niacin, with hepatic dysfunction, with active peptic ulcer or with arterial bleeding.

**WARNINGS**

Use of this drug in pregnancy, lactation or in women of child-bearing age requires that the potential benefits of the drug be weighed against its possible hazards to the mother and child. Although fetal abnormalities have not been reported with this drug, its use as an antilipidemic agent requires high dosages, and animal reproduction or teratology studies have not been done. There are insufficient studies done for usage in children.
Keep out of reach of children.

**PRECAUTIONS**

Great caution must be exercised when niacin is used in patients with coronary disease or gallbladder disease. Patients with a past history of jaundice, liver disease or peptic ulcer should be observed closely while taking the medication. Frequent monitoring of liver function tests and blood glucose should be performed during therapy to ascertain that the drug has no adverse effects on these organ systems. Antihypertensive drugs of the adrenergic-blocking type may have an additive vasodilating effect and produce postural hypotension. Elevated uric acid levels have occurred, therefore use with caution in patients predisposed to gout.
**Drug Interactions:** Antihypertensive drugs may have an additive vasodilating effect and produce postural hypotension. Diabetic or potential diabetic patients should be observed closely in the event of decreased glucose tolerance. Adjustment of diet and/or hypoglycemic therapy may be necessary.

**ADVERSE REACTIONS**

Atrial fibrillation and other cardiac arrhythmias
Severe generalized flushing
Decreased glucose tolerance
Activaton of peptic ulcers
Abnormalities of hepatic functional tests
Jaundice
Gastrointestinal disorders
Dryness of the skin
Acanthosis Nigricans
Pruritus
Hyperuricemia
Toxic amblyopia
Hypotension
Transient headache

**OVERDOSAGE**

High doses of nicotinic acid may produce temporary flushing, pruritus, and gastrointestinal distress.

**DOSAGE AND ADMINISTRATION**

Usually Recommended Adult Dosage—1 to 2 grams three times a day. The dosage must be adjusted to the response of the patient. Start with two tablets (1 g) three times a day with food or after meals, taken with cold liquids, if necessary to facilitate swallowing. Since low dosages may control hyperlipidemia in some patients, the dosage should be individualized according to the effect on serum lipid levels. If the plasma cholesterol and/or triglyceride level does not show a decrease after a reasonable time at this dosage, an increase in dosage may be considered but requires careful titration and observation of the patient for unwanted effects. The dosage may be increased every 2 to 4 weeks, but in no case should the dosage exceed 6 grams/day.
Since flushing, pruritis and gastrointestinal distress appear frequently and tend to be dose-related, increase the dosage gradually in increments of 500 mg (1 tablet) while carefully observing the patient and monitoring the plasma cholesterol and/or triglyceride level for therapeutic response and for adverse effects. Where the observed adverse reactions or potential hazards exceed the benefits of use, dosage should be reduced to the minimum recommended dosage and, where necessary, discontinued entirely.

**HOW SUPPLIED**

White scored tablets with "NIACOR" imprinted on one side, containing 500 mg niacin each, in bottles of 100, (NDC 0245-0066-11). Dispense in tight container as defined in the USP. Store at controlled room temperature, 15°–30°C (59°–86°F).
**CAUTION:** Federal law prohibits dispensing without a prescription.
Manufactured for
UPSHER-SMITH LABORATORIES, INC.
Minneapolis, MN
55447
by
Halsey Drug Co., Inc.
Brooklyn, NY USA
11233-3599

**OMS® Concentrate** Ⓒ ℞
**Morphine Sulfate (Immediate Release) Concentrated Oral Solution**

**DESCRIPTION**

Each ml of OMS® Concentrate contains:
Morphine Sulfate .......... 20 mg
**(WARNING: May be habit forming)**

**HOW SUPPLIED**

**OMS® Concentrate**
**(Morphine Sulfate Immediate Release, Concentrated Oral Solution)**
**20 mg per ml**
NDC 0245–0167–31: Bottle of 30 ml with calibrated dropper.
NDC 0245–0167–04: Bottle of 120 ml with calibrated dropper.

**RMS® Suppositories** Ⓒ ℞
**Rectal Morphine Sulfate**

**WARNING—MAY BE HABIT FORMING**

**DESCRIPTION**

Suppositories contain 5, 10, 20, or 30 mg of morphine sulfate.

**HOW SUPPLIED**

RMS® Suppositories are individually sealed and unit dose labeled. 12 suppositories per carton.
5 mg NDC 0245-0160-12, 10 mg NDC 0245-0161-12
20 mg NDC 0245-0162-12, 30 mg NDC 0245-0163-12

**SSKI®** ℞
**Potassium Iodide Oral Solution, USP**

**DESCRIPTION**

SSKI® (potassium iodide oral solution, USP) is a saturated solution of potassium iodide containing 1 g of potassium iodide per ml.

**HOW SUPPLIED**

SSKI® (potassium iodide oral solution, USP) is supplied in 1 fluid ounce (30 ml) bottles (NDC 0245-0003-31) with a calibrated dropper marked to deliver 0.3 ml and 0.6 ml; and 8 fluid ounces (237 ml) bottles (NDC 0245-0003-08).

**SALSITAB®** ℞
*[sal 'si "tab]*
**(salsalate)**
**Tablets**

**DESCRIPTION**

Salsitab® (salsalate) is a nonsteroidal anti-inflammatory agent for oral administration.
Each round, blue, film coated Salsitab® Tablet contains 500 mg salsalate. Each capsule-shaped, blue, scored, film coated Salsitab® Tablet contains 750 mg salsalate.

**HOW SUPPLIED**

500 mg tablets in bottles of 100 (NDC 0245-0153-11)
500 mg tablets in bottles of 500 (NDC 0245-0153-15)
500 mg tablets in cartons of 100 unit dose (NDC 0245-0153-01)
750 mg tablets in bottles of 100 (NDC 0245-0154-11)
750 mg tablets in bottles of 500 (NDC 0245-0154-15)
750 mg tablets in cartons of 100 unit dose (NDC 0245-0154-01)

**SLO–NIACIN®** OTC
*[slō "nī '-a-sin]*
**polygel controlled-release niacin tablets**
**(Nicotinic Acid)**
**250, 500, and 750 mg**

**DESCRIPTION**

Slo-Niacin® Tablets are manufactured utilizing a unique, patent pending, polygel controlled-release delivery system. This exclusive technology assures the gradual and measured release of niacin and is designed to significantly reduce the

incidence of flushing and itching commonly associated with niacin use. Slo-Niacin® Tablets are available in 250, 500, and 750 mg strengths.

**USES**

Slo-Niacin® Tablets are used in all those conditions in which niacin supplementation is indicated. It has the advantage of a slower release of niacin than conventional tablet dosage forms. This may permit its use by those who do not tolerate immediate-release tablets.

**CAUTIONS**

Niacin may cause flushing, itching and skin reddening. The effects are temporary and usually disappear. Persons taking niacin supplements for prolonged periods of time should do so under the care of a physician. Slo-Niacin® Tablets should not be used by persons with a known sensitivity to niacin (nicotinic acid, vitamin $B_3$) and by persons with heart or gallbladder disease, gout, arterial bleeding, glaucoma, severe diabetes, impaired liver function, peptic ulcer, or by pregnant women. Patients taking hypertensive drugs should consult a physician before taking niacin tablets.

**SIDE EFFECTS**

Temporary flushing and feeling of warmth may be expected. These seldom reach levels so as to necessitate discontinuance. If these symptoms persist, discontinue use and consult a physician. Temporary headache, itching and tingling, gastric disturbances, skin rash, and allergies may occur.

**DOSAGE**

Usual adult dose—One Slo-Niacin® Tablet morning and evening or as directed by physician.

**NOTE:** Slo-Niacin® Tablets may be broken on the score line but should not be crushed or chewed. The expended matrix is not absorbed and may be excreted intact in the stool. Keep out of reach of children.

**HOW SUPPLIED**

250 mg tablets in bottles of 100: List No. 0245–0062–11
250 mg tablets in bottles of 1000: List No. 0245–0062–10
500 mg tablets in bottles of 100: List No. 0245–0063–11
500 mg tablets in unit dose cartons of 100: List No. 0245–0063–01
750 mg tablets in bottles of 100: List No. 0245–0064–11
Polygel is a trademark of Upsher-Smith Laboratories, Inc.

*Shown in Product Identifications Section, page 433*

## Vitaline Formulas
**722 JEFFERSON AVE**
**ASHLAND, OR 97520**

### BIOTIN FORTE ℞
**A Medical Food Supplement**

FOR USE UNDER MEDICAL SUPERVISION TO MEET NUTRITIONAL REQUIREMENTS IN SPECIFIC MEDICAL CONDITIONS.

3mg (3000mcg) Biotin, Folic Acid with other B-Complex Vitamins, Vitamin C and Zinc.

and

**Extra Stength 5mg BIOTIN FORTE**

5mg (5000mcg) Biotin, Folic Acid, with other B-Complex Vitamins and Vitamin C. No Zinc

**HOW SUPPLIED**

Biotin Forte—yellow coated tablets in bottles of 60 NDC 54022-1098-01 and 1000 NDC 54022-1098-02. Extra Strength 5mg Biotin Forte—light green coated tablets in bottles of 60 NDC 54022-1075-01 and 1000 NDC 54022-1075-02.

**LITERATURE AND SAMPLES**

On request by physicians or Registered Dietitians.

### L-CARNITINE USP OTC
250mg tablets

**HOW SUPPLIED**

Bottles of 90 tablets.
250mg tablets NDC 54022-2100-1

### COENZYME $Q_{10}$ (Ubiquinone) OTC
**25mg & 60mg**

**DESCRIPTION**

Coenzyme $Q_{10}$ is an essential nutrient that is a cofactor in the mitochondrial electron transport chain, the biochemical pathway in cellular respiration from which ATP and metabolic energy is derived. Since nearly all cellular functions are dependent on energy, Coenzyme $Q_{10}$ is essential for the health of all human tissues and organs. The involvement of Coenzyme $Q_{10}$ as a redox carrier of the respiratory chain is well established on the basis of both reconstitution studies and kinetic evidence.

**HOW SUPPLIED**

25mg tablets in bottles of 60 NDC 54022-2055-01
60mg tablets in bottles of 30 NDC 54022-2081-01
60mg tablets in bottles of 60 NDC 54022-2080-01
60mg tablets in bottles of 1000 NDC 54022-2081-02

**High Lipase** OTC
### 8X PANCREATIN 900mg USP
**(non enteric coated)**
**Equivalent to pancreatin 7200mg USP**
**Pancreatic Enzyme Replacement**

**Each Tablet Provides:**

| | |
|---|---|
| Lipase | 22,500 USP Units |
| Protease | 180,000 USP Units |
| Amylase | 180,000 USP Units |

**PRECAUTIONS**

Use with caution in patients known to be allergic to pork protein.

**Suggested Use**

Usual dosage: As a digestive supplement, one or two tablets with each meal or as directed by physician.

**HOW SUPPLIED**

Uncoated tablets in bottles of 60 NDC 54022-1034-01 and 1000 NDC 54022-1034-02.

### PHOS-EX® 167 and PHOS-EX® 250 OTC
*[foss -x ]*
**(Calcium Acetate)**
**A Medical Food Supplement**

FOR USE UNDER MEDICAL SUPERVISION TO MEET NUTRITIONAL REQUIREMENTS IN SPECIFIC MEDICAL CONDITIONS OF PATIENTS WITH RENAL DISEASE.

**DESCRIPTION**

PHOS-EX® (Calcium Acetate) is a clinically proven soluble and bioavailable form of calcium, ideal as a calcium supplement and as an aluminum-free calcium supplement for patients with end-stage renal disease, mild to moderate renal insufficiency and renal osteodystrophy.

**Each Tablet Provides:**

PHOS-EX® 167 (167mg elemental calcium from 668mg Ca acetate).
PHOS-EX® 250 (250mg elemental calcium from 1000mg Ca acetate).

**SUGGESTED USE**

**PHOS-EX 167:** Two or three tablets with each meal or as directed by physician.
**PHOS-EX 250:** One or two tablets with each meal or as directed by physician.

**HOW SUPPLIED**

Bottles of 180 and 1000 tablets.

| | | |
|---|---|---|
| 167 mg., 180s ea | | 54022-9000-01 |
| | 1000s ea | 54022-9000-02 |
| 250 mg., 180s ea | | 54022-9250-01 |
| | 1000s ea | 54022-9250-02 |

**LITERATURE AND SAMPLES**

On request by physician or registered renal dietitian.

### TOTAL FORMULA OTC
**(High Potency Multivitamin/Multimineral Supplement with micro-trace elements.**
**An iron free formula is also available.**

**DESCRIPTION**

TOTAL FORMULA utilizes a unique technique of microspheres within the tablet to protect the delicate nutrients from moisture, air and the incompatibilities of certain minerals. Vitaline's microsphere technique also protects those nutrients that are susceptible to acid hydrolysis.

| Each tablet provides: | | | % U.S. RDA* |
|---|---|---|---|
| **Vitamins** | | | |
| A (As Beta Carotene 5000 I.U. and Water Dispersible Palmitate 5000 I.U.) | 10,000 | I.U. | 200 |
| D-3 | 400 | I.U. | 100 |
| E (Water Dispersible D-Alpha Tocopherol Succinate) | 30 | I.U. | 100 |
| K (Water Dispersible) | 70 | mcg | 70 |
| C (Ascorbic Acid) | 100 | mg | 166 |
| B-1 (Thiamine) | 15 | mg | 1000 |
| B-2 (Riboflavin) | 15 | mg | 882 |
| B-3 (Niacinamide) | 25 | mg | 400 |
| B-5 (Pantothenic Acid) | 25 | mg | 250 |
| B-6 (Pyridoxine) | 25 | mg | 1250 |
| B-12 (On Ion Exchange Resin) | 25 | mcg | 416 |
| Folic Acid | 400 | mcg | 100 |
| Biotin | 300 | mcg | 100 |
| Choline (Bitartrate) | 10 | mg | |
| Hesperidin Complex | 10 | mg | |
| Citrus Bioflavinoids | 10 | mg | |
| Rutin | 10 | mg | |
| Inositol | 10 | mg | |
| PABA (Para Amino Benzoic Acid) | 8 | mg | |
| **Minerals** | | | |
| Calcium (As calcium citrate and calcium carbonate) | 100 | mg | 10 |
| Iron (Ferronyl™ Carbonyl Iron)*** | 20 | mg | 110 |
| Chromium (GTF Factor as Chromium Picolinate 100mcg and Chromium Polynicotinate 100mcg) | 200 | mcg | ** |

The minerals and trace elements below are provided as amino acid chelates.

| | | | |
|---|---|---|---|
| Magnesium | 100 | mg | 25 |
| Potassium | 25 | mg | ** |
| Zinc | 30 | mg | 200 |
| Copper | 2 | mg | 100 |
| Manganese | 6 | mg | ** |
| Iodine | 100 | mcg | 66 |
| Selenium | 200 | mcg | ** |
| Molybdenum | 100 | mcg | ** |
| Silicon | 2.4 | mg | ** |
| Vanadium | 25 | mcg | ** |
| Boron | 1 | mg | ** |

Chlorophyll coloring in coating

***** TOTAL FORMULA IS ALSO AVAILABLE WITHOUT IRON**

*U.S. Recommended Daily Allowance for adults and children over 12 years of age. **Need in human nutrition established, RDA not determined.

**HOW SUPPLIED**

Bottles of 60 tablets NDC 54022-1042-3
Bottles of 90 tablets NDC 54022-1042-01
Bottles of 1000 tablets NDC 54022-1042-02

**Literature and Samples:** On request by physician.

## Wallace Laboratories
**P.O. BOX 1001**
**CRANBURY, NJ 08512**

### AQUATENSEN® ℞
**(methyclothiazide, USP 5 mg)**
**Tablets**

### BUTISOL SODIUM® Ⓒ ℞
**(butabarbital sodium)**
**Tablets and Elixir**

**DESCRIPTION**

BUTISOL SODIUM (butabarbital sodium) is a nonselective central nervous system depressant which is used as a sedative or hypnotic (WARNING: May be habit-forming). It is available for oral administration as *Tablets* containing 15 mg, 30 mg, 50 mg or 100 mg butabarbital sodium; and as *Elixir* containing 30 mg/5 mL, with alcohol (by volume) 7%. Other ingredients in the Tablets are: calcium stearate, corn starch, dibasic calcium phosphate, FD&C Blue No. 1 (15 mg and 30 mg only), FD&C Blue No. 2 (100 mg only); FD&C Red No. 3 (15 mg and 100 mg only), FD&C Yellow No. 5 (30 mg and 50 mg only)—see Precautions), FD&C Yellow No. 6 (100 mg only). Other ingredients in the Elixir are: D&C Green No. 5, edetate disodium, FD&C Yellow No. 5 (see Precautions), flavors (natural and artificial), propylene glycol, purified water, saccharin sodium, sodium benzoate. Butabarbital sodium occurs as a white, bitter powder which is freely soluble in water and alcohol, but practically insoluble in benzene and ether.

The structural formula for butabarbital sodium is:




Sodium 5-*sec*-butyl-5-ethylbarbiturate

*Continued on next page*

JAN 08 1993
DEMCO
DEC 12 1991

REDACTED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ABBOTT LABORATORIES and ABBOTT RESPIRATORY LLC,<br><br>Plaintiffs,<br><br>v.<br><br>LUPIN LIMITED and LUPIN PHARMACEUTICALS, INC.,<br><br>Defendants. | ) | C.A. No. 09-152-JJF |

**DECLARATION OF FRANK SACKS IN SUPPORT OF PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF**

I, Frank Sacks M.D., submit this declaration in support of the Opening Claim Construction Brief of Plaintiffs Abbott Laboratories and Abbott Respiratory LLC (collectively, "Plaintiffs" or "Abbott").

## I. INTRODUCTION

1. I have been retained by Abbott to provide expert opinions and testimony in the above-captioned case. I understand that Abbott has sued Lupin Limited and Lupin Pharmaceuticals, Inc. (collectively "Lupin") for infringement of U.S. Patent No. 6,080,428 ("the '428 patent"), U.S. Patent No. 6,129,930 ("the '930 patent"), U.S. Patent No. 7,011,848 ("the '848 patent"), U.S. Patent No. 6,406,715 ("the '715 patent"), U.S. Patent No. 6,746,691 ("the '691 patent"), U.S. Patent No. 6,676,967 ("the '967 patent"), and U.S. Patent No. 6,818,229 ("the '229 patent") (collectively, the "Kos Patents"). I have been asked to provide some background regarding hyperlipidemia and the treatment of hyperlipidemia, and, in particular, the use of niacin to treat hyperlipidemia in the early to mid-1990s. In addition, I have been asked to

medical conditions, personal and family medical history, and any other factors affecting the patient's overall risk of heart disease.

40. I understand that Lupin contends that the phrase "significant increase in HDL cholesterol" means "at least a 20% increase in a patient's HDL profile." I disagree. In my opinion, the term "significant increase in HDL cholesterol" does not refer to a specific numerical threshold. There is no fixed percentage that is recognized in the field as constituting a "significant" increase in HDL. As explained above, whether a particular increase in HDL cholesterol is "significant" is patient specific. In some patients, an increase of considerably less than 20% would be deemed "significant" if it contributes to a lowering of the individual's risk of developing cardiovascular disease. Therefore, a person of skill in the art would not require an increase in HDL cholesterol to exceed 20% in order for it to be considered significant in all cases.

41. In my opinion therefore, one of ordinary skill in the art in the early to mid-1990s would have understood the term a "significant increase in HDL cholesterol" to mean a substantial increase in the level of HDL cholesterol in the patient's blood.

#### ***2. Little Or No Serious Liver Damage ('428 Patent) / Minimum Liver Damage ('848 Patent)***

42. In my opinion, one of ordinary skill in the art in the early to mid-1990s would have understood the phrases "little or no serious liver damage" and "minimum liver damage" to mean no treatment-limiting hepatotoxicity requiring discontinuation of treatment (*i.e.*, withdrawal of niacin treatment altogether or a change in the dose administered).

43. In light of the long-standing concerns regarding the incidence of hepatotoxicity with sustained release niacin, when a patient is being treated with niacin, they undergo routine liver function tests, which examine the levels of liver enzymes, such as alanine

aminotransferase ("ALT"), aspartate aminotransferase ("AST"), and alkaline phosphatase, in a patient's blood. A common endpoint used by the U.S. Food and Drug Administration and clinicians for assessing potential hepatotoxicity is if these liver enzymes exceed three times the upper limit of normal ("ULN"). However, this measure is merely a guidepost, and neither a minimum threshold nor a maximum limit in all cases. On the one hand, a liver function test showing elevations above three times ULN might not necessarily indicate hepatotoxicity requiring discontinuation of niacin treatment. For example, if an individual consumed alcohol prior to testing, it might result in elevated liver enzymes. For this reason, if a patient's liver function test reveals elevated liver enzymes, the doctor is likely to request additional tests to confirm the results (particularly in the absence of other symptoms of hepatotoxicity). On the other hand, a patient may have liver enzymes lower than three times ULN and yet have other symptoms indicative of hepatotoxicity that may warrant discontinuation of niacin treatment. The tolerable level of liver enzymes for any individual patient depends upon the unique characteristics of that patient, including factors such as the patient's starting level of liver enzymes before treatment, other medical conditions, and personal and family medical history. Based on the results of confirmed liver enzyme tests along with an understanding of these other factors, a clinician will exercise his or her judgment, guided by training and experience, in deciding whether or not to continue niacin treatment.

44. I understand that Lupin contends that "little or no serious liver damage" and "minimum liver damage" to mean an increase in AST, ALT and alkaline phosphatase of no more than 9%. I disagree. As I explained above, there is no "one size fits all" threshold for assessing liver damage, and it requires an evaluation of numerous factors, not just the results of liver enzyme tests. Therefore, in my opinion, one of ordinary skill in the art in the early to mid-

1990s would not have understood "little or no serious liver damage" or "minimum liver damage" to refer only to patients exhibiting an increase in liver enzymes of 9% or more. Similarly, one of ordinary skill in the art in the early to mid-1990s would not have assumed that any patient exhibiting even a one-time increase in liver enzymes of 9% or more was necessarily experiencing liver damage.

45. Accordingly, in my opinion, the phrases "little or no serious liver damage" and "minimum liver damage" as used in the '428 patent and '848 patent, respectively, mean no treatment-limiting hepatotoxicity requiring treatment to be discontinued by the patient.

#### ***3. Treatment-Limiting Hepatotoxicity…Which Would Require Said Treatment To Be Discontinued By The Patient ('930 Patent) / Treatment-Limiting Hepatotoxicity…In The Individual To A Level Which Would Require Use Of The Intermediate Nicotinic Acid Formulation By The Individual To Be Discontinued ('967 Patent)***

46. In my opinion, one of ordinary skill in the art in the early to mid-1990s would have understood the phrases "treatment-limiting hepatotoxicity…which would require said treatment to be discontinued by the patient" and "treatment-limiting hepatotoxicity…in the individual to a level which would require use of the intermediate nicotinic acid formulation by the individual to be discontinued" to mean repeated increases in liver enzymes (in particular, AST, ALT, and/or alkaline phosphatase) to a level that is clinically significant and requires discontinuation of treatment.

47. As I explained above, although liver function tests are a common method of monitoring potential hepatotoxicity in patients taking niacin to treat hyperlipidemia, clinicians do not rely exclusively on the results of a single liver function test to determine whether or not to continue niacin treatment. Instead, they would look for confirmation of the test results through a repeat test, and consider the results of such tests along with other patient-specific information. If, based on this universe of information as well as his/her experience and

training, a clinician concludes that the elevation in liver enzymes is clinically significant (*i.e.*, indicative of liver toxicity as a result of the niacin treatment), then the clinician may make the decision to discontinue treatment.

48. I understand that Lupin contends that "treatment-limiting hepatotoxicity…which would require said treatment to be discontinued by the patient" and "treatment-limiting hepatotoxicity…in the individual to a level which would require use of the intermediate nicotinic acid formulation by the individual to be discontinued" mean AST levels greater than 150 mU/mL, ALT levels greater than 165 mU/mL and/or alkaline phosphatase levels greater than 420 mU/mL. I disagree for the same reasons explained above.

#### *4. Abnormalities In Either Uric Acid Or Glucose Levels Or Both To An Extent Which Would Require Said Daily Treatment To Be Discontinued By The Patient ('930 Patent, Cl. 51) / Treatment-Limiting . . . Elevations In Uric Acid Levels Or Glucose Levels Or Both In The Patient To A Level Which Would Require Said Treatment To Be Discontinued By The Patient ('930 Patent, Cl. 115) / Treatment-Limiting Elevations In Uric Acid Or Glucose Levels Or Both In The Individual To A Level Which Would Require Use Of The Intermediate Nicotinic Acid Formulation By The Individual To Be Discontinued ('967 Patent)*

49. I understand that the parties dispute the meaning of the following terms:

- abnormalities in either uric acid or glucose levels or both to an extent which would require said daily treatment to be discontinued by the patient ('930 patent);
- treatment-limiting . . . elevations in uric acid levels or glucose levels or both in the patient to a level which would require said treatment to be discontinued by the patient ('930 patent); and
- treatment-limiting elevations in uric acid or glucose levels or both in the individual to a level which would require use of the intermediate nicotinic acid formulation by the individual to be discontinued ('967 patent).

50. In my opinion, these phrases all refer to repeated elevations in either uric acid levels, glucose levels, or both to a level that is clinically significant and requires discontinuation of treatment.

51. As explained above with respect to liver toxicity, in light of the concerns relating to increases in uric acid and/or glucose levels from sustained release niacin products, when a patient is being treated for hyperlipidemia using niacin therapy, the doctor will require them to undergo regular blood tests to monitor their uric acid and glucose levels. Typically, blood samples will be sent for analysis to third party laboratories. Each laboratory establishes its own "reference ranges" of "normal" to account for any variabilities in assays or equipment. When the results of the blood test are reported, the laboratory will also report its reference ranges to assist the doctor in evaluating the patient's results. As a result, there is no single range of "normal" for uric acid levels and glucose levels. In addition, as in the case of liver function tests, if a lab report shows that a patient's uric acid or glucose levels are outside the reference range, it would be my practice, and I believe that of my colleagues in the field, to run a second test to confirm that the increase was not a one-time occurrence. If further tests confirm the increase, then the doctor must evaluate the data in the context of other factors, such as the patient's baseline levels, age, gender, ethnicity, other medical conditions and personal and family medical history, and make a judgment, based on his or her education and training, as to whether or not to discontinue treatment. For example, the doctor may decide, based on all of these factors, that the elevations in uric acid or glucose may be managed through other medications or treatment, and that the disadvantages of withdrawing the patient from niacin treatment outweigh the potential risks posed by the elevated uric acid or glucose levels. It is my opinion that this practice is consistent with the practice of physicians throughout the 1990s.

52. I understand that Lupin contends that "abnormalities in either uric acid or glucose levels or both to an extent which would require said daily treatment to be discontinued by the patient," "treatment-limiting . . . elevations in uric acid levels or glucose levels or both in

the patient to a level which would require said treatment to be discontinued by the patient," and "treatment-limiting elevations in uric acid or glucose levels or both in the individual to a level which would require use of the intermediate nicotinic acid formulation by the individual to be discontinued" mean repeated levels of either uric acid in the bloodstream beyond 7.5 mg/dl in women or 8.5 mg/dl in men, or a level of glucose in the bloodstream beyond 115 mg/dl in women or 125 mg/dl in men. I disagree. As in the case of liver toxicity, there is no single numerical threshold for uric acid increases or glucose increases above which a doctor will automatically withdraw a patient from niacin treatment. I note that the American Diabetes Association currently uses several different measures to define diabetes, and these measures have changed from time to time over the years. With respect to fasting blood glucose, the ADA says that levels of 126 mg/dl or higher are indicative of diabetes. However, in my opinion, simply because a patient has a blood test indicating glucose levels greater than 126 mg/dl does not necessitate discontinuing niacin treatment. Instead, the elevations in either uric acid or glucose need to be assessed in the context of other patient-specific factors. Accordingly, in my opinion, persons of ordinary skill in the art in the early to mid-1990s would not have applied the strict numerical thresholds proposed by Lupin in determining whether elevations in either uric acid or glucose levels were treatment-limiting.

53. Therefore, it is my opinion that persons of ordinary skill in the art in the early to mid-1990s would have understood the phrases "abnormalities in either uric acid or glucose levels or both to an extent which would require said daily treatment to be discontinued by the patient," "treatment-limiting . . . elevations in uric acid levels or glucose levels or both in the patient to a level which would require said treatment to be discontinued by the patient," and "treatment-limiting elevations in uric acid or glucose levels or both in the individual to a level

which would require use of the intermediate nicotinic acid formulation by the individual to be discontinued" to refer to repeated elevations in either uric acid levels, glucose levels, or both to a level that is clinically significant and requires discontinuation of treatment.

### *5. Minimum . . . Uric Acid Increases, Or Elevations In Fasting Glucose Levels ('848 patent)*

54. It is my opinion that the phrase "minimum . . . uric acid increases, or elevations in fasting glucose levels" means no treatment-limiting elevations in uric acid levels or glucose levels which require discontinuation of treatment. As explained above, clinicians do not rely exclusively on results of a single blood test showing elevations in either uric acid or glucose levels to determine whether or not to continue niacin treatment. Instead, they would seek confirmation of the test results through a repeat test, and weigh the results of such tests along with other patient-specific information before concluding, based on his or her experience and training, that it is necessary to discontinue niacin treatment, rather than attempting to address the elevations through other means.

55. I understand that Lupin contends that "minimum . . . uric acid increases, or elevations in fasting glucose levels" means an increase of no more than 8.4% in bloodstream uric acid levels or no more than 7.5% in bloodstream glucose levels. I disagree for the same reasons explained above in Paragraph 46.

56. Therefore, in my opinion, the phrase "minimum . . . uric acid increases, or elevations in fasting glucose levels" as used in the '848 patent means no treatment-limiting elevations in uric acid levels or glucose levels requiring treatment to be discontinued by the patient.

57. As this case is ongoing, I may supplement the opinions expressed herein at a later date based upon further information provided to me.

I declare under the penalty of perjury that the above is true and correct.

Dated: March 1, 2010

Frank Sacks, M.D.

REDACTED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ABBOTT LABORATORIES and ABBOTT RESPIRATORY LLC,<br><br>Plaintiffs,<br><br>v.<br><br>LUPIN LIMITED and LUPIN PHARMACEUTICALS, INC.,<br><br>Defendants. | ) | C.A. No. 09-152-JJF |

**DECLARATION OF THOMAS S. FOSTER IN SUPPORT OF PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF**

I, Thomas S. Foster, Pharm.D., submit this declaration in support of the Opening Claim Construction Brief of Plaintiffs Abbott Laboratories and Abbott Respiratory LLC (collectively, "Plaintiffs" or "Abbott").

## I. INTRODUCTION

1. I have been retained by Abbott to provide expert opinions and testimony in the above-captioned case. In particular, in this Declaration I have been asked to explain the background of some of the inventions of U.S. Patent Nos. 6,080,428 ("the '428 patent"), 6,129,930 ("the '930 patent"), 7,011,848 ("the '848 patent"), 6,406,715 ("the '715 patent"), 6,818,229 ("the '229 patent"), 6,676,967 ("the '967 patent"), and 6,746,691 ("the '691 patent") (collectively, the "Kos Patents"). In addition, I have been asked to comment on the meaning of certain terms in the claims of the Kos Patents from the perspective of one of ordinary skill in the art in the 1990s.

| CLAIM NO(S). | TERM/PHRASE | ABBOTT'S PROPOSED CONSTRUCTION | LUPIN'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| | "about 12 µghr/ml" (NUA AUC) | approximately 12 µghr/ml | No less than 10.8 µghr/ml |
| | "about 19 µghr/ml" (NUA AUC) | approximately 19 µghr/ml | No more than 20.9 µghr/ml |

56. In my opinion, one skilled in the art in the 1990s would have understood the term "about" in the context of the Kos Patents to mean "approximately." The term "about" reflects the uncertainty inherent in any analytical testing – whether *in vitro* or *in vivo* – of a drug product and its properties. As I noted earlier, there is inherent variability in the measurements that result from such testing due to a variety of factors, such as the accuracy of the assay, the tolerances of the equipment, the accuracy of the method/technique utilized by the technician performing the test, how accurately the data are reported, and any rounding conventions that may be utilized. As a result, repeated measurements of the same property may not yield exactly the same result due to the limitations of accuracy and precision associated with measurement and testing techniques.

57. I understand that the defendants wish to assign strict numerical ranges of +/- 10% (depending on the context) to each of the "about" limitations set forth above. In my opinion, this interpretation is erroneous and is insupportable. There simply is no hard and fast rule that a tolerance of +/- 10% is appropriate in all cases.

58. As this case is ongoing, I may supplement the opinions herein at a later date based upon further information provided to me.

I declare under the penalty of perjury that the above is true and correct.

Dated: March 1, 2010

Thomas S. Foster, Pharm.D.

REDACTED

# USP XXII

# THE UNITED STATES PHARMACOPEIA

*Official from January 1, 1990*

TWENTY-SECOND
REVISION

92 / 982

Arzneimittelwerk Dresden GmbH
Wissenschaftliche Bibliothek
Meißner Straße 35
O-8122 RADEBEUL

NOTICE AND WARNING

*Concerning U.S. Patent or Trademark Rights*

The inclusion in the Pharmacopeia or in the National Formulary of a monograph on any drug in respect to which patent or trademark rights may exist shall not be deemed, and is not intended as, a grant of, or authority to exercise, any right or privilege protected by such patent or trademark. All such rights and privileges are vested in the patent or trademark owner, and no other person may exercise the same without express permission, authority, or license secured from such patent or trademark owner.

*Concerning Use of USP or NF Text*

Attention is called to the fact that USP and NF text is fully copyrighted. Authors and others wishing to use portions of the text should request permission to do so from the Secretary of the USPC Board of Trustees.

© 1989 The United States Pharmacopeial Convention, Inc.
12601 Twinbrook Parkway, Rockville, MD 20852
*All rights reserved*
Library of Congress Catalog Card Number 83-640088
ISSN 0195-7996
ISBN 0-913595-37-3 (cloth)
0-913595-38-1 (leather)

Printed by Mack Printing Company, Easton, PA 18042

special circumstances. However, Pharmacopeial standards and procedures are interrelated; therefore, where a difference appears or in the event of dispute, only the result obtained by the procedure given in this Pharmacopeia is conclusive.

In the performance of assay or test procedures, not less than the specified number of dosage units should be taken for analysis. Proportionately larger or smaller quantities than the specified weights and volumes of assay or test substances and Reference Standards may be taken, provided the measurement is made with at least equivalent accuracy and provided that any subsequent steps, such as dilutions, are adjusted accordingly to yield concentrations equivalent to those specified and are made in such manner as to provide at least equivalent accuracy.

Where it is directed in an assay or a test that a certain quantity of substance or a counted number of dosage units is to be examined, the specified quantity or number is a minimal figure chosen only for convenience of analytical manipulation; it is not intended to restrict the total quantity of substance or number of units that may be subjected to the assay or test or that should be tested in accordance with good manufacturing practices.

Where it is directed in the assay of Tablets to "weigh and finely powder not less than" a given number, usually 20, of the Tablets, it is intended that a counted number of Tablets shall be weighed and reduced to a powder. The portion of the powdered tablets taken for assay is representative of the whole Tablets and is, in turn, weighed accurately. The result of the assay is then related to the amount of active ingredient per Tablet by multiplying this result by the average Tablet weight and dividing by the weight of the portion taken for the assay.

Similarly, where it is directed in the assay of Capsules to remove, as completely as possible, the contents of not less than a given number, usually 20, of the Capsules, it is intended that a counted number of Capsules should be carefully opened and the contents quantitatively removed, combined, mixed, and weighed accurately. The portion of mixed Capsules contents taken for the assay is representative of the contents of the Capsules and is, in turn, weighed accurately. The result of the assay is then related to the amount of active ingredient per Capsule by multiplying this result by the average weight of Capsule content and dividing by the weight of the portion taken for the assay.

Where the definition in a monograph states the tolerances as being "calculated on the dried [or anhydrous or ignited] basis," the directions for drying or igniting the sample prior to assaying are generally omitted from the *Assay* procedure. Assay and test procedures may be performed on the undried or unignited substance and the results calculated on the dried, anhydrous, or ignited basis, provided a test for *Loss on drying*, or *Water*, or *Loss on ignition*, respectively, is given in the monograph. Where the presence of moisture or other volatile material may interfere with the procedure, previous drying of the substance is specified in the individual monograph and is obligatory.

Throughout a monograph that includes a test for *Loss on drying* or *Water*, the expression "previously dried" without qualification signifies that the substance is to be dried as directed under *Loss on drying* or *Water* (gravimetric determination).

Unless otherwise directed in the test or assay in the individual monograph or in a general chapter, USP Reference Standards are to be dried before use, or used without prior drying, specifically in accordance with the instructions given in the section, *Reference Standard(s)* and on the label of the Reference Standard. Where the label instructions differ in detail from those in the monograph section, the label text is determinative.

In stating the appropriate quantities to be taken for assays and tests, the use of the word "about" indicates a quantity within 10 percent of the specified weight or volume. However, the weight or volume taken is accurately determined and the calculated result is based upon the exact amount taken. The same tolerance applies to specified dimensions.

Where the use of a pipet is directed for measuring a specimen or an aliquot in conducting a test or an assay, the pipet conforms to the standards set forth under *Volumetric Apparatus* ⟨31⟩, and is to be used in such manner that the error does not exceed the limit stated for a pipet of its size. Where a pipet is specified, a suitable buret, conforming to the standards set forth under *Volumetric Apparatus* ⟨31⟩, may be substituted. Where a "to contain" pipet is specified, a suitable volumetric flask may be substituted.

Expressions such as "25.0 mL" and "25.0 mg," used with respect to volumetric or gravimetric measurements, indicate that the quantity is to be "accurately measured" or "accurately weighed" within the limits stated under *Volumetric Apparatus* ⟨31⟩ or under *Weights and Balances* ⟨41⟩.

The term "transfer" is used generally to specify a quantitative manipulation.

The term "concomitantly," used in such expressions as "concomitantly determine" or "concomitantly measured," in directions for assays and tests, is intended to denote that the determinations or measurements are to be performed in immediate succession. See also *Use of Reference Standards* under *Spectrophotometry and Light-scattering* ⟨851⟩.

*Blank Determination*—Where it is directed that "any necessary correction" be made by a blank determination, the determination is to be conducted using the same quantities of the same reagents treated in the same manner as the solution or mixture containing the portion of the substance under assay or test, but with the substance itself omitted.

*Desiccator*—The expression "in a desiccator" specifies the use of a tightly closed container of suitable size and design that maintains an atmosphere of low moisture content by means of silica gel or other suitable desiccant.

A "vacuum desiccator" is one that maintains the low-moisture atmosphere at a reduced pressure of not




Fig. 1. Basket Stirring Element.




Fig. 2. Paddle Stirring Element.

the test. The metallic blade and shaft comprise a single entity that may be coated with a suitable inert coating. The dosage unit is allowed to sink to the bottom of the vessel before rotation of the blade is started. A small, loose piece of nonreactive material such as not more than a few turns of wire helix may be attached to dosage units that would otherwise float.

**Apparatus Suitability Test**—Individually test 1 tablet of the *USP Dissolution Calibrator, Disintegrating Type*[3] and 1 tablet of *USP Dissolution Calibrator, Nondisintegrating Type*,[3] according to the operating conditions specified. The apparatus is suitable if the results obtained are within the acceptable range stated in the certificate for that calibrator in the apparatus tested.

**Dissolution Medium**—Use the solvent specified in the individual monograph. If the *Dissolution Medium* is a buffered solution, adjust the solution so that its pH is within 0.05 unit of the pH specified in the individual monograph. [NOTE—Dissolved gases can cause bubbles to form which may change the results of the test. In such cases, dissolved gases should be removed prior to testing.]

**Time**—Where a single time specification is given, the test may be concluded in a shorter period if the requirement for minimum amount dissolved is met. If two or more times are specified, specimens are to be withdrawn only at the stated times, within a tolerance of ±2%.

**Procedure for Capsules, Uncoated Tablets, and Plain Coated Tablets**—Place the stated volume of the *Dissolution Medium* in the vessel of the apparatus specified in the individual monograph, assemble the apparatus, equilibrate the *Dissolution Medium* to 37 ± 0.5°, and remove the thermometer. Place 1 tablet or 1 capsule in the apparatus, taking care to exclude air bubbles from the surface of the dosage-form unit, and immediately operate the apparatus at the rate specified in the individual monograph. Within the time interval specified, or at each of the times stated, withdraw a specimen from a zone midway between the surface of the *Dissolution Medium* and the top of the rotating basket or blade, not less than 1 cm from the vessel wall. Perform the analysis as directed in the individual monograph. Repeat the test with additional dosage form units.

Where capsule shells interfere with the analysis, remove the contents of not less than 6 capsules as completely as possible, and dissolve the empty capsule shells in the specified volume of *Dissolution Medium*. Perform the analysis as directed in the individual monograph. Make any necessary correction. Correction factors greater than 25% of the labeled content are unacceptable.

**Interpretation**—Unless otherwise specified in the individual monograph, the requirements are met if the quantities of active ingredient dissolved from the units tested conform to the accompanying acceptance table. Continue testing through the three stages unless the results conform at either $S_1$ or $S_2$. The quantity, $Q$, is the amount of dissolved active ingredient specified in the individual monograph, expressed as a percentage of the labeled content; both the 5% and 15% values in the acceptance table are percentages of the labeled content so that these values and $Q$ are in the same terms.

**Acceptance Table**

| Stage | Number Tested | Acceptance Criteria |
|---|---|---|
| $S_1$ | 6 | Each unit is not less than $Q + 5\%$. |
| $S_2$ | 6 | Average of 12 units ($S_1 + S_2$) is equal to or greater than $Q$, and no unit is less than $Q - 15\%$. |
| $S_3$ | 12 | Average of 24 units ($S_1 + S_2 + S_3$) is equal to or greater than $Q$, not more than 2 units are less than $Q - 15\%$, and no unit is less than $Q - 25\%$. |

## ⟨721⟩ DISTILLING RANGE

To determine the range of temperatures within which an official liquid distils, or the percentage of the material that distils between two specified temperatures, use Method I or Method II

[3] Available from USP-NF Reference Standards, 12601 Twinbrook Parkway, Rockville, MD 20852.

culate the content of active ingredient in each of the capsules, assuming homogeneous distribution of the active ingredient.

SOFT CAPSULES—Determine the net weight of the contents of individual capsules as follows: Weigh accurately the 10 intact capsules individually to obtain their gross weights, taking care to preserve the identity of each capsule. Then cut open the capsules by means of a suitable clean, dry cutting instrument such as scissors or a sharp open blade, and remove the contents by washing with a suitable solvent. Allow the occluded solvent to evaporate from the shells at room temperature over a period of about 30 minutes, taking precautions to avoid uptake or loss of moisture. Weigh the individual shells, and calculate the net contents. From the results of the *Assay*, obtained as directed in the individual monograph, calculate the content of active ingredient in each of the capsules, assuming homogeneous distribution of the active ingredient.

SOLIDS IN SINGLE-UNIT CONTAINERS and STERILE SOLIDS FOR PARENTERAL USE—Proceed as directed under *Hard Capsules*, treating each unit as described therein.

## CONTENT UNIFORMITY

For the determination of dosage-form uniformity by assay of individual units, select not less than 30 units, and proceed as follows for the dosage form designated.

UNCOATED AND COATED TABLETS, HARD AND SOFT CAPSULES, TRANSDERMAL SYSTEMS, SUSPENSIONS IN SINGLE-UNIT CONTAINERS, INHALATIONS IN SINGLE-UNIT CONTAINERS, and SOLIDS (INCLUDING STERILE SOLIDS) IN SINGLE-UNIT CONTAINERS—Assay 10 units individually as directed in the *Assay* in the individual monograph, unless otherwise specified in the test for *Content uniformity*. Where the amount of active ingredient in a single dose unit is less than required in the *Assay*, adjust the degree of dilution of the solutions and/or the volume of aliquots so that the concentration of the active ingredients in the final solution is of the same order as that obtained in the *Assay* procedure; or, in the case of a titrimetric assay, use a more dilute titrant, if necessary, so that an adequate volume of titrant is required (see *Titrimetry* ⟨541⟩); see also *Procedures* under *Tests and Assays* in the *General Notices*. If any such modifications are made in the *Assay* procedure set forth in the individual monograph, make the appropriate corresponding changes in the calculation formula and titration factor.

Where a special procedure is specified in the test for *Content uniformity* in the individual monograph, make any necessary correction of the results obtained as follows.

(1) Prepare a composite specimen of a sufficient number of dosage units to provide the amount of specimen called for in the *Assay* in the individual monograph plus the amount required for the special procedure given in the test for *Content uniformity* in the monograph by finely powdering tablets or mixing the contents of capsules or suspensions or solids in single-unit containers to obtain a homogeneous mixture. If a homogeneous mixture cannot be obtained in this manner, use suitable solvents or other procedures to prepare a solution containing all of the active ingredient, and use appropriate aliquot portions of this solution for the specified procedures.

(2) Assay separate, accurately measured portions of the composite specimen of capsules or tablets or suspensions or inhalations or solids in single-unit containers, both (a) as directed in the *Assay*, and (b) using the special procedure given in the test for *Content uniformity* in the monograph.

(3) Calculate the weight of active ingredient equivalent to 1 average dosage unit, by (a) using the results obtained by the *Assay* procedure, and by (b) using the results obtained by the special procedure.

(4) Calculate the correction factor, $F$, by the formula:

$$F = A/P,$$

in which $A$ is the weight of active ingredient equivalent to 1 average dosage unit obtained by the *Assay* procedure, and $P$ is the weight of active ingredient equivalent to 1 average dosage unit obtained by the special procedure.

(5) If $F$ is between 0.970 and 1.030 no correction is required.

(6) If $F$ is not within 0.970 and 1.030, calculate the weight of active ingredient in each dosage unit by multiplying each of the weights found using the special procedure by $F$.

## Calculation of the Relative Standard Deviation

The use of pre-programmed calculators or computers is acceptable. A manual mathematical method is as follows:

$s$ = sample standard deviation.

$RSD$ = relative standard deviation (the sample standard deviation expressed as a percentage of the mean).

$\overline{X}$ = mean of the values obtained from the units tested, expressed as a percentage of the label claim.

$n$ = number of units tested.

$x_1, x_2, x_3 \ldots x_n$ = individual values ($x_i$) of the units tested, expressed as a percentage of the label claim.

$$s = \left[\frac{\Sigma(x_i - \overline{X})^2}{n - 1}\right]^{1/2}$$

$$RSD = \frac{100s}{\overline{X}}.$$

## Criteria

Apply the following criteria, unless otherwise specified in the individual monograph.

(*A*) *If the Average of the Limits Specified in the Potency Definition in the Individual Monograph is 100.0 Percent or Less*—

COMPRESSED TABLETS (COATED OR UNCOATED), SUSPENSIONS IN SINGLE-UNIT CONTAINERS, SOLIDS (INCLUDING STERILE SOLIDS) IN SINGLE-UNIT CONTAINERS, and STERILE SOLIDS FOR PARENTERAL USE—Unless otherwise specified in the individual monograph, the requirements for dose uniformity are met if the amount of the active ingredient in each of the 10 dosage units as determined from the *Weight variation* or the *Content uniformity* method lies within the range of 85.0 percent to 115.0 percent of the label claim and the *Relative standard deviation* is less than or equal to 6.0 percent.

If 1 unit is outside the range of 85.0 percent to 115.0 percent of label claim and no unit is outside the range of 75.0 percent to 125.0 percent of label claim, or if the *Relative standard deviation* is greater than 6.0 percent, or if both conditions prevail, test 20 additional units. The requirements are met if not more than 1 unit of the 30 is outside the range of 85.0 percent to 115.0 percent of label claim and no unit is outside the range of 75.0 percent to 125.0 percent of label claim and the *Relative standard deviation* of the 30 dosage units does not exceed 7.8 percent.

CAPSULES, TRANSDERMAL SYSTEMS, INHALATIONS, AND MOLDED TABLETS—Unless otherwise specified in the individual monograph, the requirements for dose uniformity are met if the amount of the active ingredient in not less than 9 of the 10 dosage units as determined from the *Weight variation* or the *Content uniformity* method lies within the range of 85.0 percent to 115.0 percent of label claim and no unit is outside the range of 75.0 percent to 125.0 percent of label claim and the *Relative standard deviation* of the 10 dosage units is less than or equal to 6.0 percent.

If 2 or 3 dosage units are outside the range of 85.0 percent to 115.0 percent of label claim, but not outside the range of 75.0 percent to 125.0 percent of label claim, or if the *Relative standard deviation* is greater than 6.0 percent or if both conditions prevail, test 20 additional units. The requirements are met if not more than 3 units of the 30 are outside the range of 85.0 percent to 115.0 percent of label claim and no unit is outside the range of 75.0 percent to 125.0 percent of label claim, and the *Relative standard deviation* of the 30 dosage units does not exceed 7.8 percent.

(*B*) *If the Average of the Limits Specified in the Potency Definition in the Individual Monograph is Greater than 100.0 Percent*—

(1) If the average value of the dosage units tested is 100.0 percent or less, the requirements are as in (*A*).

(2) If the average value of the dosage units tested is greater than or equal to the average of the limits specified in the potency definition in the individual monograph, the requirements are as in (*A*), except that the words "label claim" are replaced by the words "label claim multiplied by the average of the limits specified in the potency definition in the monograph divided by 100."

(3) If the average value of the dosage units tested is between 100 percent and the average of the limits specified in the potency definition in the individual monograph, the requirements are as

(3) *Methyl salicylate.* Liquid preparations containing more than 5 percent by weight of methyl salicylate, other than those packaged in pressurized spray containers, shall be packaged in accordance with the provisions of § 1700.15(a), (b), and (c).

(4) *Controlled drugs.* Any preparation for human use that consists in whole or in part of any substance subject to control under the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 801 et seq.) and that is in a dosage form intended for oral administration shall be packaged in accordance with the provisions of § 1700.15(a), (b), and (c).

(6) *Turpentine.* Household substances in liquid form containing 10 percent or more by weight of turpentine shall be packaged in accordance with the provisions of § 1700.15(a) and (b).

(10) *Prescription drugs.* Any drug for human use that is in a dosage form intended for oral administration and that is required by Federal law to be dispensed only by or upon an oral or written prescription of a practitioner licensed by law to administer such drug shall be packaged in accordance with the provisions of § 1700.15(a), (b), and (c), except for the following:

(i) Sublingual dosage forms of nitroglycerin.

(ii) Sublingual and chewable forms of isosorbide dinitrate in dosage strengths of 10 milligrams or less.

(iii) Erythromycin ethylsuccinate granules for oral suspension and oral suspensions in packages containing not more than 8 grams of the equivalent of erythromycin.

(iv) Cyclically administered oral contraceptives in manufacturers' mnemonic (memory-aid) dispenser packages that rely solely upon the activity of one or more progestogen or estrogen substances.

(v) Anhydrous cholestyramine in powder form.

(vi) All unit-dose forms of potassium supplements, including individually wrapped effervescent tablets, unit-dose vials of liquid potassium, and powdered potassium in unit-dose packets, containing not more than 50 milliequivalents of potassium per unit dose.

(vii) Sodium fluoride drug preparations, including liquid and tablet forms, containing no more than 264 milligrams of sodium fluoride per package and containing no other substances subject to this § 1700.14(a)(10).

(viii) Betamethasone tablets packaged in manufacturers' dispenser packages, containing no more than 12.6 milligrams betamethasone.

(ix) Pancrelipase preparations in tablet, capsule, or powder form and containing no other substances subject to this § 1700.14(a)(10).

(x) Prednisone in tablet form, when dispensed in packages containing no more than 105 mg of the drug, and containing no other substances subject to this § 1700.14(a)(10).

(xiii) Mebendazole in tablet form in packages containing not more than 600 mg of the drug, and containing no other substance subject to the provisions of this section.

(xiv) Methylprednisolone in tablet form in packages containing not more than 84 mg of the drug and containing no other substance subject to the provisions of this section.

(xv) Colestipol in powder form in packages containing not more than 5 grams of the drug and containing no other substance subject to the provisions of this section.

(xvi) Erythromycin ethylsuccinate tablets in packages containing no more than the equivalent of 16 grams erythromycin.

(xvii) Conjugated Estrogen Tablets, USP, when dispensed in mnemonic packages containing not more than 32.0 mg of the drug and containing no other substances subject to this § 1700.14(a)(10).

(xviii) Norethindrone Acetate Tablets, USP, when dispensed in mnemonic packages containing not more than 50 mg of the drug and containing no other substances subject to this § 1700.14(a)(10).

(12) *Iron-containing drugs.* With the exception of: (i) Animal feeds used as vehicles for the administration of drugs, and (ii) those preparations in which iron is present solely as a colorant, noninjectable animal and human drugs providing iron for therapeutic or prophylactic purposes, and containing a total amount of elemental iron, from any source, in a single package, equivalent to 250 mg or more elemental iron in a concentration of 0.025 percent or more on a weight to volume basis for liquids and 0.05 percent or more on a weight-to-weight basis for nonliquids (e.g., powders, granules, tablets, capsules, wafers, gels, viscous products, such as pastes and ointments, etc.) shall be packaged in accordance with the provisions of § 1700.15(a), (b), and (c).

(13) *Dietary supplements containing iron.* With the exception of those preparations in which iron is present solely as a colorant, dietary supplements, as defined in § 1700.1(a)(3), that contain an equivalent of 250 mg or more of elemental iron, from any source, in a single package in concentrations of 0.025 percent or more on a weight to volume basis for liquids and 0.05 percent or more on a weight-to-weight basis for nonliquids (e.g., powders, granules, tablets, capsules, wafers, gels, viscous products, such as pastes and ointments, etc.) shall be packaged in accordance with the provisions of § 1700.15(a), (b), and (c).

(16) *Acetaminophen.* Preparations for human use in a dosage form intended for oral administration and containing in a single package a total of more than one gram acetaminophen shall be packaged in accordance with the provisions of § 1700.15(a), (b), and (c), except the following—

(i) Effervescent tablets or granules containing acetaminophen, provided the dry tablet or granules contain less than 10 percent acetaminophen, the tablet or granules have an oral LD-50 of greater than 5 grams per kilogram of body weight, the measured dosage of the product, when placed in water, releases at least 85 milliliters of carbon dioxide per grain of acetaminophen in the dry form when measured stoichiometrically at standard conditions (0°C, 760 mm Hg) and the tablets or granules contain no other substance subject to this § 1700.14(a).

(ii) Unflavored acetaminophen-containing preparations in powder form (other than those intended for pediatric use) that are packaged in unit doses providing not more than 13 grains of acetaminophen per unit dose and that contain no other substance subject to this § 1700.14(a).

(17) *Diphenhydramine.* Preparations for human use in a dosage form intended for oral administration and containing more than the equivalent of 66 mg diphenhydramine base in a single package shall be packaged in accordance with the provisions of § 1700.15(a), (b), and (c), if packaged on or after February 11, 1985.

# ⟨1151⟩ PHARMACEUTICAL DOSAGE FORMS

Dosage forms are provided for most of the Pharmacopeial drug substances, but the processes for the preparation of many of them are, in general, beyond the scope of the Pharmacopeia. In addition to defining the dosage forms, this section presents the general principles involved in the manufacture of some of them, particularly on a small scale. Other information that is given bears on the use of the Pharmacopeial substances in extemporaneous compounding of dosage forms.

## BIOAVAILABILITY

Bioavailability, or the extent to which the therapeutic constituent of a pharmaceutical dosage form intended for oral or topical use is available for absorption is influenced by a variety of factors. Among the inherent factors known to affect absorption are the method of manufacture or method of compounding; the particle size and crystal form or polymorph of the drug substance; and the diluents and excipients used in formulating the dosage form, including fillers, binders, disintegrating agents, lubricants, coatings, solvents, suspending agents, and dyes. Lubricants and coatings are foremost among these. The maintenance of a demonstrably high degree of bioavailability requires particular attention to all aspects of production and quality control that may affect the nature of the finished dosage form.

## STABILITY

The term "stability," with respect to a drug dosage form, refers to the time lapse from initial preparation and packaging during which the dosage form continues to fulfill the specifications presented in the monograph on identity, strength, quality, and purity. The monograph specifications apply throughout the shelf-life of the product. Stability of manufactured dosage forms should be demonstrated by the manufacturer by the use of methods adequate for the purpose. Monograph assays may be used for stability testing if they are stability-indicating, i.e., if they accurately

differentiate between the intact drug molecules and their degradation products. Stability considerations should include not only the specific compendial requirements, but also changes in physical appearance of the product that would warn users of the product that its continued integrity is questionable.

Expiration dating is a valuable quality attribute and is required for all Pharmacopeial dosage forms. The expiration date preferably should be accompanied by specific storage conditions as provided in the Pharmacopeia for this purpose (see *Preservation, Packaging, Storage, and Labeling* under *General Notices*). Adequate stability data acquired by the manufacturer should be available to support the expiration date and storage conditions specified.

The stability parameters of a drug dosage form can be influenced by environmental conditions of storage (temperature, light, air, and humidity), as well as the package components. Pharmacopeial articles preferably should include required storage conditions on their labeling. These are the conditions under which the expiration date shall apply. The storage requirements must be observed throughout the distribution of the article, i.e., beyond the time it leaves the manufacturer up to and including its handling by the dispenser or seller of the article to the consumer. Although labeling for the consumer should indicate proper storage conditions, it is recognized that control beyond the dispenser or seller is difficult.

A discussion of aspects of drug product stability that are of primary concern to the pharmacist in the dispensing of medications may be found under *Stability Considerations in Dispensing Practice* ⟨1191⟩.

Inasmuch as this chapter is for purposes of general information only, no statement herein is intended to modify or supplant any of the specific requirements pertinent to pharmaceutical preparations, which are given elsewhere in this Pharmacopeia.

## Terminology

Occasionally it is necessary to add solvent to the contents of a container just prior to use, usually because of instability of some drugs in the diluted form. Thus, a solid diluted to yield a suspension is called "________ for Suspension;" a solid dissolved and diluted to yield a solution is called "________ for Solution;" and a solution or suspension diluted to yield a more dilute form of the drug is called "________ Oral Concentrate" or "________ Injection Concentrate" as appropriate for the route of administration of the drug. After dilution, it is important that the drug be homogeneously dispersed before administration.

## Aerosols

Pharmaceutical aerosols are products that are packaged under pressure and contain therapeutically active ingredients that are released upon activation of an appropriate valve system. They are intended for topical application to the skin as well as local application into the nose (nasal aerosols), mouth (lingual aerosols), or lungs (inhalation aerosols).

The term "aerosol" refers to the fine mist of spray that results from most pressurized systems. However, the term has been broadly misapplied to all self-contained pressurized products, some of which deliver foams or semisolid fluids. In the case of *Inhalation Aerosols*, the particle size of the delivered medication must be carefully controlled and the average size of the particles should be under 10 µm. These products are also known as metered dose inhalers (MDIs). (See *Inhalations*.) Other aerosol sprays may contain particles up to several hundred micrometers in diameter.

The basic components of an aerosol system are the container, the propellant, the concentrate containing the active ingredient(s), the valve, and the actuator. The nature of these components determines such characteristics as particle size distribution, uniformity of valve delivery for metered valves, delivery rate, wetness and temperature of the spray, foam density, or fluid viscosity.

### TYPES OF AEROSOLS

Aerosols consist of two-phase (gas and liquid) or three-phase (gas, liquid, and solid or liquid) systems. The two-phase aerosol consists of a solution of active ingredients in liquefied propellant and the vaporized propellant. The solvent is composed of the propellant or a mixture of the propellant and co-solvents such as alcohol, propylene glycol, and polyethylene glycols which are often used to enhance the solubility of the active ingredients.

Three-phase systems consist of a suspension or emulsion of the active ingredient(s) in addition to the vaporized propellants. A suspension consists of the active ingredient(s) which may be dispersed in the propellant system with the aid of suitable excipients such as wetting agents and/or solid carriers such as talc or colloidal silicas.

A foam aerosol is an emulsion containing one or more active ingredients, surfactants, aqueous or nonaqueous liquids, and the propellants. If the propellant is in the internal (discontinuous) phase (i.e., of the oil-in-water type), a stable foam is discharged, and if the propellant is in the external (continuous) phase (i.e., of the water-in-oil type), a spray or a quick-breaking foam is discharged.

### PROPELLANTS

The propellant supplies the necessary pressure within an aerosol system to expel material from the container and, in combination with other components, to convert the material into the desired physical form. Propellants may be broadly classified as liquefied or compressed gases having vapor pressures generally exceeding atmospheric pressure. Propellants within this definition include various hydrocarbons, especially fluorochloro-derivatives of methane and ethane, low molecular weight hydrocarbons such as the butanes and pentanes, and compressed gases such as carbon dioxide, nitrogen, and nitrous oxide. Mixtures of propellants are frequently used to obtain desirable pressure, delivery, and spray characteristics. A good propellant system should have the proper vapor pressure characteristics consistent with the other aerosol components.

### VALVES

The primary function of the valve is to regulate the flow of the therapeutic agent and propellant from the container. The spray characteristics of the aerosol are influenced by orifice dimension, number, and location. Most aerosol valves provide for continuous spray operation and are used on most topical products. However, pharmaceutical products for oral or nasal inhalation often utilize metered dose valves that must deliver a uniform quantity of spray upon each valve activation. The accuracy and reproducibility of the doses delivered from metering valves are generally good, comparing favorably to the uniformity of solid dosage forms such as tablets and capsules. However, when aerosol packages are stored improperly, or when they have not been used for long periods of time, valves must be primed before use. Materials used for the manufacture of valves should be inert to the formulations used. Plastic, rubber, aluminum, and stainless steel valve components are commonly used. Metered-dose valves must deliver an accurate dose within specified tolerances.

### ACTUATORS

An actuator is the fitting attached to an aerosol valve stem which, when depressed or moved, opens the valve, and directs the spray containing the drug preparation to the desired area. The actuator usually indicates the direction in which the preparation is dispensed and protects the hand or finger from the refrigerant effects of the propellant. Actuators incorporate an orifice which may vary widely in size and shape. The size of this orifice, the expansion chamber design, and the nature of the propellant and formulation influence the physical characteristics of the spray, foam, or stream of solid particles dispensed. For inhalation or oral dose aerosols, an actuator capable of delivering the medication in the proper particle size range is utilized.

### CONTAINERS

Aerosol containers usually are made of glass, plastic, or metal, or a combination of these materials. Glass containers must be precisely engineered to provide the maximum in pressure safety and impact resistance. Plastics may be employed to coat glass containers for improved safety characteristics, or to coat metal containers to improve corrosion resistance and enhance stability of the formulation. Suitable metals include stainless steel, aluminum, and tin-plated steel.

[redacted]

MANUFACTURE

Aerosols are usually prepared by one of two general processes. In the "cold-fill" process, the concentrate (generally cooled to a temperature below 0°) and the refrigerated propellant are measured into open containers (usually chilled). The valve-actuator assembly is then crimped onto the container to form a pressure-tight seal. During the interval between propellant addition and crimping, sufficient volatilization of propellant occurs to displace air from the container. In the "pressure-fill" method, the concentrate is placed in the container, and either the propellant is forced under pressure through the valve orifice after the valve is sealed, or the propellant is allowed to flow under the valve cap and then the valve assembly is sealed ("under-the-cap" filling). In both cases of the "pressure-fill" method, provision must be made for evacuation of air by means of vacuum or displacement with a small amount of propellant. Manufacturing process controls usually include monitoring of proper formulation and propellant fill weight, and pressure testing and leak testing of the finished aerosol.

LABELING

Medicinal aerosols should contain at least the following warning information on the label as in accordance with appropriate regulations.

*Warning*—Avoid inhaling. Keep away from eyes or other mucous membranes.

The statement "Avoid inhaling" is not necessary for preparations specifically designed for use by inhalation.

The phrase "or other mucous membranes" is not necessary for preparations specifically designed for use on mucous membranes.

*Warning*—Contents under pressure. Do not puncture or incinerate container. Do not expose to heat or store at temperatures above 120°F (49°C). Keep out of reach of children.

In addition to the aforementioned warnings, the label of a drug packaged in an aerosol container in which the propellant consists in whole or in part of a halocarbon or hydrocarbon shall, where required under regulations of the Food and Drug Administration, bear the following warning:

*Warning*—Do not inhale directly; deliberate inhalation of contents can cause death.

or

*Warning*—Use only as directed; intentional misuse by deliberately concentrating and inhaling the contents can be harmful or fatal.

## Capsules

Capsules are solid dosage forms in which the drug is enclosed within either a hard or soft soluble container or "shell" made from a suitable form of gelatin. Hard gelatin capsule sizes range from No. 5, the smallest, to No. 000, which is the largest, except for veterinary sizes. However, size No. 0 generally is the largest size acceptable to patients. Hard shell capsules consist of two, telescoping cap and body pieces. Generally, there are unique grooves or indentations molded into the cap and body portions to provide a positive closure when fully engaged which helps prevent the accidental separation of the filled capsules during shipping and handling. Positive closure also may be effected by spot fusion ("welding") of the cap and body pieces together through direct thermal means or by application of ultrasonic energy. Factory-filled hard shell capsules may be completely sealed by banding, a process in which one or more layers of gelatin are applied over the seam of the cap and body, or by a liquid fusion process wherein the filled capsules are wetted with a hydroalcoholic solution which penetrates into the space where the cap overlaps the body, and then dried. The latter two methods in particular may improve the stability of contents by limiting oxygen penetration as well as enhancing the consumer safety of over-the-counter capsules by making them difficult to open without causing visible, obvious damage. Industrially filled capsules also are often of distinctive color and shape or are otherwise marked to identify them with the manufacturer.

In extemporaneous prescription practice, hard gelatin capsules may be hand-filled; this permits the prescriber a latitude of choice in selecting either a single drug or a combination of drugs at the exact dosage level considered best for the individual patient. This flexibility gives hard shell capsules an advantage over tablets and soft gelatin capsules as a dosage form.

Hard gelatin capsules are made from gelatins having relatively high gel strength. Either type may be used, but blends of pork skin and bone gelatin are often used to optimize shell clarity and toughness. Hard gelatin capsules may also contain colorants, such as D & C and FD & C dyes or the various iron oxides, opaquing agents such as titanium dioxide, dispersing agents, hardening agents such as sucrose, and preservatives. They normally contain between 10 and 15% water.

Hard shell capsules are made by a process that involves dipping shaped pins into gelatin solutions, after which the gelatin films are dried, trimmed, and removed from the pins, and the body and cap pieces are joined. The empty capsules should be stored in tight containers until they are filled. Since they are of animal origin, they should be protected from potential sources or microbial contamination.

Hard shell capsules typically are filled with powder, beads, or granules. Semisolids or liquids also may be filled into hard shell capsules; however, when the latter are encapsulated, one of the sealing techniques must be employed to prevent leakage.

In all filling operations, the body and cap of the shell are separated prior to dosing. Machines employing various dosing principles may be employed to fill powders into hard shell capsules; however, most fully automatic machines form powder plugs by compression and eject them into empty capsule bodies. Accessories to these machines generally are available for the other types of fills. Powder formulations often require adding fillers, lubricants, and glidants to the active ingredients to facilitate encapsulation. The formulation, as well as the method of filling, particularly the degree of compaction, may influence the rate of drug release. The addition of wetting agents to the powder mass is common where the active ingredient is hydrophobic. Disintegrants also may be included in powder formulations to facilitate deaggregation and dispersal of capsule plugs in the gut.

Powder mixtures which tend to liquefy may be dispensed in hard shell capsules if an absorbent such as magnesium carbonate, colloidal silicon dioxide or other suitable substance is used. Potent drugs are often mixed with an inert diluent before being filled into capsules. Where two mutually incompatible drugs are prescribed together, it is sometimes possible to place one in a small capsule and then enclose it with the second drug in a larger capsule. Incompatible drugs also can be separated by placing coated pellets or tablets, or soft gelatin capsules of one drug into the capsule shell before adding the second drug.

Thixotropic semisolids may be formed by gelling liquid drugs or vehicles with colloidal silicas or powdered high molecular weight polyethylene glycols. Various waxy or fatty compounds may be used to prepare semisolid matrices by fusion.

Soft gelatin capsules (sometimes called softgels) require large-scale production methods. The gelatin shell is somewhat thicker than that of hard shell capsules and is plasticized by the addition of a polyol such as sorbitol or glycerin. The ratio of dry plasticizer to dry gelatin determines the "hardness" of the shell and may be varied to accommodate environmental conditions as well as the nature of the contents. Like hard shells, the shell composition may include approved dyes and pigments, opaquing agents such as titanium dioxide, and preservatives. Flavors may be added and up to 5% sucrose may be included for its sweetness and to produce a chewable shell. Soft gelatin shells normally contain 6% to 13% water.

In most cases, soft gelatin capsules are filled with liquid contents. Typically, active ingredients are dissolved or suspended in a liquid vehicle. Classically, an oleaginous vehicle such as a vegetable oil was used; however, nonaqueous, water-miscible liquid vehicles such as the lower molecular weight polyethylene glycols are more common today due to fewer bioavailability problems.

Available in a wide variety of sizes and shapes, soft gelatin capsules are both formed, filled, and sealed in the same machine; typically, this is a rotary die process, although a plate process or reciprocating die process also may be employed. Soft gelatin capsules also may be manufactured in a bubble process which forms seamless spherical capsules. With suitable equipment, powders, and other dry solids also may be filled into soft gelatin capsules.

Liquid-filled capsules of either type involve similar formulation technology and offer similar advantages and limitations. For instance, both may offer advantages over dry-filled capsules and

tablets in content uniformity and drug dissolution. Greater homogeneity is possible in liquid systems, and liquids can be metered more accurately. Drug dissolution may be a benefit because the drug may already be in solution or at least suspended in a hydrophilic vehicle. However, the contact between the hard or soft shell and its liquid content is more intimate than exists with dry-filled capsules, and this may enhance the chances for undesired interactions. The liquid nature of capsule contents presents different technological problems than dry-filled capsules in regard to disintegration and dissolution testing. From formulation, technological, and biopharmaceutical points of view, liquid-filled capsules of either type have more in common than liquid-filled and dry-filled capsules having the same shell composition. Thus, for compendial purposes, standards and methods should be established based on capsule contents rather than on whether the contents are filled into hard or soft gelatin capsules.

**Enteric-coated Capsules**—Capsules may be coated, or, more commonly, encapsulated granules may be coated to resist releasing the drug in the gastric fluid of the stomach where a delay is important to alleviate potential problems of drug inactivation or gastric mucosal irritation. The term "delayed-release" is used for Pharmacopeial monographs on enteric-coated capsules that are intended to delay the release of medicament until the capsule has passed through the stomach, and the individual monographs include tests and specifications for *Drug release* (see *Drug Release* ⟨724⟩).

**Extended-release Capsules**—Extended-release capsules are formulated in such manner as to make the contained medicament available over an extended period of time following ingestion. Expressions such as "prolonged-action," "repeat-action," and "sustained-release" have been used also to describe such dosage forms. However, the term "extended-release" is used for Pharmacopeial purposes and requirements for *Drug release* ⟨724⟩ typically are specified in the individual monographs.

## Creams

Creams are semisolid dosage forms containing one or more drug substances dissolved or dispersed in a suitable base. This term has traditionally been applied to semisolids that possess a relatively fluid consistency formulated as either water-in-oil (*Cold Cream*) or oil-in-water (e.g., *Fluocinolone Acetonide Cream*) emulsions. However, more recently the term has been restricted to products consisting of oil-in-water emulsions or aqueous microcrystalline dispersions of long chain fatty acids or alcohols that are water washable and more cosmetically and aesthetically acceptable. Creams can be used for administering drugs via the vaginal route (e.g., *Triple Sulfa Vaginal Cream*).

## Elixirs

See *Solutions*.

## Emulsions

Emulsions are two-phase systems in which one liquid is dispersed throughout another liquid in the form of small droplets. Where oil is the dispersed phase and an aqueous solution is the continuous phase, the system is designated as an oil-in-water emulsion. Conversely, where water or an aqueous solution is the dispersed phase and oil or oleaginous material is the continuous phase, the system is designated as a water-in-oil emulsion. Emulsions are stabilized by emulsifying agents which prevent coalescence, the merging of small droplets into larger droplets and, ultimately, into a single separated phase. Emulsifying agents (surfactants) do this by concentrating in the interface between the droplet and external phase, and by providing a physical barrier around the particle to coalescence. Surfactants also reduce the interfacial tension between the phases, thus increasing the ease of emulsification upon mixing.

Natural, semisynthetic, and synthetic hydrophilic polymers may be used in conjunction with surfactants in oil-in-water emulsions as they accumulate at interfaces and also increase the viscosity of the aqueous phase, thereby decreasing the rate of formation of aggregates of droplets. Aggregation is generally accompanied by a relatively rapid separation of an emulsion into a droplet-rich and droplet-poor phase. Normally the density of an oil is lower than that of water, in which case the oil droplets and droplet aggregates rise, a process referred to as creaming. The greater the rate of aggregation, the greater the droplet size and the greater the rate of creaming. The water droplets in a water-in-oil emulsion generally sediment because of their greater density.

The consistency of emulsions varies widely, ranging from easily pourable liquids to semisolid creams. Generally oil-in-water creams are prepared at high temperature, where they are fluid, and cooled to room temperature, whereupon they solidify as a result of solidification of the internal phase. When this is the case, a high internal-phase volume to external-phase volume ratio is not necessary for semisolid character, and, for example, stearic acid creams or vanishing creams are semisolid with as little as 15% internal phase. Any semisolid character with water-in-oil emulsions generally is attributable to a semisolid external phase.

All emulsions require an antimicrobial agent because the aqueous phase is favorable to the growth of microorganisms. The presence of a preservative is particularly critical in oil-in-water emulsions where contamination of the external phase occurs readily. Since fungi and yeasts are found with greater frequency than bacteria, fungistatic as well as bacteriostatic properties are desirable. Bacteria have been shown to degrade nonionic and anionic emulsifying agents, glycerin, and many natural stabilizers such as tragacanth and guar gum.

Complications arise in preserving emulsion systems, as a result of partitioning of the antimicrobial agent out of the aqueous phase where it is most needed, or of complexation with emulsion ingredients that reduce effectiveness. Therefore, the effectiveness of the preservative system should always be tested in the final product. Preservatives commonly used in emulsions include methyl-, ethyl-, propyl-, and butyl-parabens, benzoic acid, and quaternary ammonium compounds.

(See also *Creams* and *Ointments*.)

## Extracts and Fluidextracts

Extracts are concentrated preparations of vegetable or animal drugs obtained by removal of the active constituents of the respective drugs with suitable menstrua, evaporation of all or nearly all of the solvent, and adjustment of the residual masses or powders to the prescribed standards.

In the manufacture of most extracts, the drugs are extracted by percolation. The entire percolates are concentrated, generally by distillation under reduced pressure, in order to subject the drug principles to as little heat as possible.

Fluidextracts are liquid preparations of vegetable drugs, containing alcohol as a solvent or as a preservative, or both, and so made that, unless otherwise specified in an individual monograph, each mL contains the therapeutic constituents of 1 g of the standard drug that it represents.

A fluidextract that tends to deposit sediment may be aged and filtered or the clear portion decanted, provided the resulting clear liquid conforms to the Pharmacopeial standards.

Fluidextracts may be prepared from suitable extracts.

## Gels

Gels (sometimes called Jellies) are semisolid systems consisting of either suspensions made up of small inorganic particles or large organic molecules interpenetrated by a liquid. Where the gel mass consists of a network of small discrete particles, the gel is classified as a two-phase system (e.g., *Aluminum Hydroxide Gel*). In a two-phase system, if the particle size of the dispersed phase is relatively large, the gel mass is sometimes referred to as a magma (e.g., *Bentonite Magma*). Both gels and magmas may be thixotropic, forming semisolids on standing and becoming liquid on agitation. They should be shaken before use to ensure homogeneity and should be labeled to that effect. (See *Suspensions*.)

Single-phase gels consist of organic macromolecules uniformly distributed throughout a liquid in such a manner that no apparent boundaries exist between the dispersed macromolecules and the liquid. Single-phase gels may be made from synthetic macromolecules (e.g., *Carbomer*) or from natural gums (e.g., *Tragacanth*). The latter preparations are also called mucilages. Although these gels are commonly aqueous, alcohols and oils may be used as the continuous phase. For example, mineral oil can be combined with a polyethylene resin to form an oleaginous ointment base.

Gels can be used to administer drugs topically or into body cavities (e.g., *Phenylephrine Hydrochloride Nasal Jelly*).

[redacted]

## Implants (Pellets)

Implants or pellets are small sterile solid masses consisting of a highly purified drug (with or without excipients) made by compression or molding. They are intended for implantation in the body (usually subcutaneously) for the purpose of providing continuous release of the drug over long periods of time. Implants are administered by means of a suitable special injector or surgical incision. This dosage form has been used to administer hormones such as testosterone or estradiol. They are packaged individually in sterile vials or foil strips.

## Infusions, Intramammary

Intramammary infusions are suspensions of drugs in suitable oil vehicles. These preparations are intended for veterinary use only, and are administered by instillation via the teat canals into the udders of milk-producing animals.

## Inhalations

Inhalations are drugs or solutions or suspensions of one or more drug substances administered by the nasal or oral respiratory route for local or systemic effect.

Solutions of drug substances in sterile water for inhalation or in sodium chloride inhalation solution may be nebulized by use of inert gases. Nebulizers are suitable for the administration of inhalation solutions only if they give droplets sufficiently fine and uniform in size so that the mist reaches the bronchioles. Nebulized solutions may be breathed directly from the nebulizer or the nebulizer may be attached to a plastic face mask, tent, or intermittent positive pressure breathing (IPPB) machine.

Another group of products, also known as metered dose inhalers (MDIs) are propellant driven drug suspensions or solution in liquified gas propellant with or without a cosolvent and are intended for delivering metered doses of the drug to the respiratory tract. An MDI contains multiple doses, often exceeding several hundred. The most common single-dose volumes delivered are from 25 to 100 µl (also expressed as mg) per actuation.

Examples of MDIs containing drug solutions and suspension in this pharmacopeia are *Epinephrine Inhalation Aerosol* and *Isoproterenol Hydrochloride and Phenylephrine Bitartrate Inhalation Aerosol*, respectively.

Powders may also be administered by mechanical devices that require manually produced pressure or a deep inhalation by the patient, e.g., *Cromolyn Sodium for Inhalation*.

A special class of inhalations termed inhalants consists of drugs or combination of drugs, that by virtue of their high vapor pressure, can be carried by an air current into the nasal passage where they exert their effect. The container from which the inhalant generally is administered is known as an inhaler.

## Injections

See *Injections* ⟨1⟩.

## Irrigations

Irrigations are sterile solutions intended to bathe or flush open wounds or body cavities. They are used topically, never parenterally. They differ from large volume parenteral solutions in the way they are packaged (screw cap containers).

## Lotions

See *Solutions* or *Suspensions*.

## Lozenges

Lozenges are solid preparations containing one or more medicaments, usually in a flavored, sweetened base which are intended to dissolve or disintegrate slowly in the mouth. They can be prepared by molding (gelatin and/or fused sucrose or sorbitol base) or by compression of sugar based tablets. Molded lozenges are sometimes referred to as pastilles while compressed lozenges are often referred to as troches. They are usually intended for treatment of local irritation or infections of the mouth or throat but may contain active ingredients intended for systemic absorption after swallowing.

## Ointments

Ointments are semisolid preparations intended for external application to the skin or mucous membranes.

Ointment bases recognized for use as vehicles fall into four general classes: the hydrocarbon bases, the absorption bases, the water-removable bases, and the water-soluble bases. Each therapeutic ointment possesses as its base a representative of one of these four general classes.

**Hydrocarbon Bases**—These bases, which are known also as "oleaginous ointment bases," are represented by *White Petrolatum* and *White Ointment*. Only small amounts of an aqueous component can be incorporated into them. They serve to keep medicaments in prolonged contact with the skin and act as occlusive dressings. Hydrocarbon bases are used chiefly for their emollient effects, and are difficult to wash off. They do not "dry out" or change noticeably on aging.

**Absorption Bases**—This class of bases may be divided into two groups, the first group consisting of bases that permit the incorporation of aqueous solutions with the formation of a water-in-oil emulsion (*Hydrophilic Petrolatum* and *Anhydrous Lanolin*), and the second group consisting of water-in-oil emulsions that permit the incorporation of additional quantities of aqueous solutions (*Lanolin* and *Cold Cream*). Absorption bases are useful also as emollients.

**Water-removable Bases**—Such bases are oil-in-water emulsions, e.g., *Hydrophilic Ointment*, and are more correctly called "creams." (See *Creams*.) They are described also as "water-washable," since they may be readily washed from the skin or clothing with water, an attribute that makes them more acceptable for cosmetic reasons. Some medicaments may be more effective in these bases than in hydrocarbon bases. Other advantages of the water-removable bases are that they may be diluted with water and that they favor the absorption of serous discharges in dermatological conditions.

**Water-soluble Bases**—This group of so-called "greaseless ointment bases" is comprised of water-soluble constituents. *Polyethylene Glycol Ointment* is the only Pharmacopeial preparation in this group. Bases of this type offer many of the advantages of the water-removable bases and, in addition, contain no water-insoluble substances such as petrolatum, anhydrous lanolin, or waxes. They are more correctly called "Gels." (See *Gels*.)

*Choice of Base*—The choice of an ointment base depends upon many factors, such as the action desired, the nature of the medicament to be incorporated and its bioavailability and stability, and the requisite shelf-life of the finished product. In some cases, it is necessary to use a base that is less than ideal in order to achieve the stability required. Drugs that hydrolyze rapidly, for example, are more stable in hydrocarbon bases than in bases containing water, even though they may be more effective in the latter.

## Ophthalmic Preparations

Drugs are administered to the eyes in a wide variety of dosage forms, some of which require special consideration. They are discussed in the following paragraphs.

**Ointments**—Ophthalmic ointments are ointments for application to the eye. Special precautions must be taken in the preparation of ophthalmic ointments. They are manufactured from sterilized ingredients under rigidly aseptic conditions and meet the requirements under *Sterility Tests* ⟨71⟩. If the specific ingredients used in the formulation do not lend themselves to routine sterilization techniques, ingredients that meet the sterility requirements described under *Sterility Tests* ⟨71⟩, along with aseptic manufacture, may be employed. Ophthalmic ointments must contain a suitable substance or mixture of substances to prevent growth of, or to destroy, microorganisms accidentally introduced when the container is opened during use, unless otherwise directed in the individual monograph, or unless the formula itself is bacteriostatic (see *Added Substances* under *Ophthalmic Ointments* ⟨771⟩). The medicinal agent is added to the ointment base either as a solution or as a micronized powder. The finished ointment must be free from large particles and must meet the requirements for *Leakage* and for *Metal Particles* under *Ophthalmic Ointments* ⟨771⟩. The immediate containers for ophthalmic ointments shall be sterile at the time of filling and closing. It is mandatory that the immediate containers for ophthalmic

ointments be sealed and tamper-proof so that sterility is assured at time of first use.

The ointment base that is selected must be non-irritating to the eye, permit diffusion of the drug throughout the secretions bathing the eye, and retain the activity of the medicament for a reasonable period under proper storage conditions.

Petrolatum is mainly used as a base for ophthalmic drugs. Some absorption bases, water-removable bases, and water-soluble bases may be desirable for water-soluble drugs. Such bases allow for better dispersion of water-soluble medicaments, but they must be non-irritating themselves to the eye.

**Solutions**—Ophthalmic solutions are sterile solutions, essentially free from foreign particles, suitably compounded and packaged for instillation into the eye. Preparation of an ophthalmic solution requires careful consideration of such factors as the inherent toxicity of the drug itself, isotonicity value, the need for buffering agents, the need for a preservative (and, if needed, its selection), sterilization, and proper packaging. Similar considerations are also made for nasal and otic products.

*Isotonicity Value*—Lacrimal fluid is isotonic with blood, having an isotonicity value corresponding to that of a 0.9% sodium chloride solution. Ideally, an ophthalmic solution should have this isotonicity value; but the eye can tolerate isotonicity values as low as that of a 0.6% sodium chloride solution and as high as that of a 2.0% sodium chloride solution without marked discomfort.

Some ophthalmic solutions are necessarily hypertonic in order to enhance absorption and provide a concentration of the active ingredient(s) strong enough to exert a prompt and effective action. Where the amount of such solutions used is small, dilution with lacrimal fluid takes place rapidly so that discomfort from the hypertonicity is only temporary. However, any adjustment toward isotonicity by dilution with tears is negligible where large volumes of hypertonic solutions are used as collyria to wash the eyes; it is therefore important that solutions used for this purpose be approximately isotonic.

*Buffering*—Many drugs, notably alkaloidal salts, are most effective at pH levels that favor the undissociated free bases. At such pH levels, however, the drug may be unstable so that compromise levels must be found and held by means of buffers. One purpose of buffering some ophthalmic solutions is to prevent an increase in pH caused by the slow release of hydroxyl ions by glass. Such a rise in pH can affect both the solubility and the stability of the drug. The decision whether or not buffering agents should be added in preparing an ophthalmic solution must be based on several considerations. Normal tears have a pH of about 7.4 and possess some buffer capacity. The application of a solution to the eye stimulates the flow of tears and the rapid neutralization of any excess hydrogen or hydroxyl ions within the buffer capacity of the tears. Many ophthalmic drugs, such as alkaloidal salts, are weakly acidic and have only weak buffer capacity. Where only 1 or 2 drops of a solution containing them are added to the eye, the buffering action of the tears is usually adequate to raise the pH and prevent marked discomfort. In some cases pH may vary between 3.5 and 8.5. Some drugs, notably pilocarpine hydrochloride and epinephrine bitartrate, are more acid and overtax the buffer capacity of the lacrimal fluid. Ideally, an ophthalmic solution should have the same pH, as well as the same isotonicity value, as lacrimal fluid. This is not usually possible since, at pH 7.4, many drugs are not appreciably soluble in water. Most alkaloidal salts precipitate as the free alkaloid at this pH. Additionally, many drugs are chemically unstable at pH levels approaching 7.4. This instability is more marked at the high temperatures employed in heat sterilization. For this reason, the buffer system should be selected that is nearest to the physiological pH of 7.4 and does not cause precipitation of the drug or its rapid deterioration.

An ophthalmic preparation with a buffer system approaching the physiological pH can be obtained by mixing a sterile solution of the drug with a sterile buffer solution using aseptic technique. Even so, the possibility of a shorter shelf-life at the higher pH must be taken into consideration, and attention must be directed toward the attainment and maintenance of sterility throughout the manipulations.

Many drugs, when buffered to a therapeutically acceptable pH, would not be stable in solution for long periods of time. These products are lyophilized and are intended for reconstitution immediately before use (e.g., *Acetylcholine Chloride for Ophthalmic Solution*).

*Sterilization*—The sterility of solutions applied to an injured eye is of the greatest importance. Sterile preparations in special containers for individual use on one patient should be available in every hospital, office, or other installation where accidentally or surgically traumatized eyes are treated. The method of attaining sterility is determined primarily by the character of the particular product (see *Sterilization and Sterility Assurance of Compendial Articles* ⟨1211⟩).

Whenever possible, sterile membrane filtration under aseptic conditions is the preferred method. If it can be shown that product stability is not adversely affected, sterilization by autoclaving in the final container is also a preferred method.

Buffering certain drugs near the physiological pH range makes them quite unstable at high temperature.

Avoiding the use of heat by employing a bacteria-retaining filter is a valuable technique, provided caution is exercised in the selection, assembly, and use of the equipment. Single-filtration, presterilized disposable units are available and should be utilized wherever possible.

*Preservation*—Ophthalmic solutions may be packaged in multiple-dose containers when intended for the individual use of one patient and where the ocular surfaces are intact. It is mandatory that the immediate containers for ophthalmic solutions be sealed and tamper-proof so that sterility is assured at time of first use. Each solution must contain a suitable substance or mixture of substances to prevent the growth of, or to destroy, microorganisms accidentally introduced when the container is opened during use.

Where intended for use in surgical procedures, ophthalmic solutions, although they must be sterile, should not contain antibacterial agents, since they may be irritating to the ocular tissues.

*Thickening agent*—A pharmaceutical grade of methylcellulose (e.g., 1% if the viscosity is 25 centipoises, or 0.25% if 4000 centipoises) or other suitable thickening agents such as hydroxypropyl methylcellulose or polyvinyl alcohol occasionally are added to ophthalmic solutions to increase the viscosity and prolong contact of the drug with the tissue. The thickened ophthalmic solution must be free from visible particles.

**Suspensions**—Ophthalmic suspensions are sterile liquid preparations containing solid particles dispersed in a liquid vehicle intended for application to the eye (see *Suspensions*). It is imperative that such suspensions contain the drug in a micronized form to prevent irritation and/or scratching of the cornea. Ophthalmic suspensions should never be dispensed if there is evidence of caking or aggregation.

**Strips**—Fluorescein sodium solution should be dispensed in a sterile, single-use container or in the form of a sterile, impregnated paper strip. The strip releases a sufficient amount of the drug for diagnostic purposes when touched to the eye being examined for a foreign body or a corneal abrasion. Contact of the paper with the eye may be avoided by leaching the drug from the strip onto the eye with the aid of sterile water or sterile sodium chloride solution.

## Pastes

Pastes are semisolid dosage forms that contain one or more drug substances intended for topical application. One class is made from a single phase aqueous gel, e.g., *Carboxymethylcellulose Sodium Paste*. The other class, the fatty pastes, e.g., *Zinc Oxide Paste*, consists of thick, stiff ointments that do not ordinarily flow at body temperature, and therefore serve as protective coatings over the areas to which they are applied.

The fatty pastes appear less greasy and more absorptive than ointments by reason of a high proportion of drug substance(s) having an affinity for water. These pastes tend to absorb serous secretions, and are less penetrating and less macerating than ointments, so that they are preferred for acute lesions that have a tendency towards crusting, vesiculation or oozing.

A dental paste is intended for adhesion to the mucous membrane for local effect (e.g., *Triamcinolone Acetonide Dental Paste*).

## Pellets

See *Implants*

[redacted]

## Powders

Powders are intimate mixtures of dry, finely divided drugs and/or chemicals that may be intended for internal (Oral Powders) or external (Topical Powders) use. Because of their greater specific surface area, powders disperse and dissolve more readily than compacted dosage forms. Children and those adults who experience difficulty in swallowing tablets or capsules may find powders more acceptable. Drugs that are too bulky to be formed into tablets or capsules of convenient size may be administered as powders. Immediately prior to use, oral powders are mixed in a beverage or apple sauce.

Often, stability problems encountered in liquid dosage forms are avoided in powdered dosage forms. Drugs that are unstable in aqueous suspensions or solutions may be prepared in the form of granules or powders. These are intended to be constituted by the pharmacist by the addition of a specified quantity of water just prior to dispensing. Because these constituted products have limited stability, they are required to have a specified expiration date after constitution and may require storage in a refrigerator.

Oral powders may be dispensed in doses pre-measured by the pharmacist, i.e., divided powders, or in bulk. Traditionally, divided powders have been wrapped in materials such as bond paper and parchment. However, the pharmacist may provide greater protection from the environment by sealing individual doses in small cellophane or polyethylene envelopes.

Bulk oral powders are limited to relatively non-potent drugs such as laxatives, antacids, dietary supplements, and certain analgesics that the patient may safely measure by the teaspoonful or capful. Other bulky powders include douche powders, tooth powders, and dusting powders. Bulk powders are best dispensed in tight, wide-mouth glass containers to afford maximum protection from the atmosphere and to prevent the loss of volatile constituents.

Dusting powders are impalpable powders intended for topical application. They may be dispensed in sifter-top containers to facilitate dusting onto the skin. In general, dusting powders should be passed through at least a 100-mesh sieve to assure freedom from grit that could irritate traumatized areas (see *Powder Fineness* ⟨811⟩).

## Solutions

Solutions are liquid preparations that contain one or more chemical substances dissolved, i.e., molecularly dispersed, in a suitable solvent or mixture of mutually miscible solvents. Since molecules in solutions are uniformly dispersed, the use of solutions as dosage forms generally provides for the assurance of uniform dosage upon administration, and good accuracy when diluting or otherwise mixing solutions.

Substances in solutions, however, are more susceptible to chemical instability than the solid state and dose for dose, generally require more bulk and weight in packaging relative to solid dosage forms. For all solutions, but particularly those containing volatile solvents, tight containers, stored away from excessive heat, should be used. Consideration should also be given to the use of light-resistant containers when photolytic chemical degradation is a potential stability problem. Dosage forms categorized as "Solutions" are classified according to route of administration, such as "Oral Solutions" and "Topical Solutions," or by their solute and solvent systems, such as "Spirits," "Tinctures," and "Waters." Solutions intended for parenteral administration are officially entitled, "Injections" (see *Injections* ⟨1⟩).

**Oral Solutions**—Oral Solutions are liquid preparations, intended for oral administration, that contain one or more substances with or without flavoring, sweetening, or coloring agents dissolved in water or cosolvent-water mixtures. Oral Solutions may be formulated for direct oral administration to the patient or they may be dispensed in a more concentrated form that must be diluted prior to administration. It is important to recognize that dilution with water of Oral Solutions containing cosolvents, such as alcohol, could lead to precipitation of some ingredients. Hence, great care must be taken in diluting concentrated solutions when cosolvents are present. Preparations dispensed as soluble solids or soluble mixtures of solids, with the intent of dissolving them in a solvent and administering them orally, are designated "for Oral Solution," e.g., *Potassium Chloride for Oral Solution*.

Oral Solutions containing high concentrations of sucrose or other sugars traditionally have been designated as Syrups. A near-saturated solution of sucrose in purified water, for example, is known as Syrup or "Simple Syrup." Through common usage the term, syrup, also has been used to include any other liquid dosage form prepared in a sweet and viscid vehicle, including oral suspensions.

In addition to sucrose and other sugars, certain polyols such as sorbitol or glycerin may be present in Oral Solutions to inhibit crystallization and to modify solubility, taste, mouth-feel, and other vehicle properties. Antimicrobial agents to prevent the growth of bacteria, yeasts, and molds are generally also present. Some sugarless Oral Solutions contain sweetening agents such as sorbitol or aspartame, as well as thickening agents such as the cellulose gums. Such viscid sweetened solutions, containing no sugars, are occasionally prepared as vehicles for administration of drugs to diabetic patients.

Many oral solutions, which contain alcohol as a cosolvent, have been traditionally designated as Elixirs. Many others, however, designated as Oral Solutions, also contain significant amounts of alcohol. Since high concentrations of alcohol can produce a pharmacologic effect when administered orally, other cosolvents, such as glycerin and propylene glycol, should be used to minimize the amount of alcohol required. To be designated as an Elixir, however, the solution must contain alcohol.

**Topical Solutions**—Topical Solutions are solutions, usually aqueous but often containing other solvents, such as alcohol and polyols, intended for topical application to the skin, or as in the case of Lidocaine Oral Topical Solution, to the oral mucosal surface. The term "lotion" is applied to solutions or suspensions applied topically.

**Otic Solutions**—Otic Solutions, intended for instillation in the outer ear, are aqueous, or they are solutions prepared with glycerin or other solvents and dispersing agents, e.g., *Antipyrine and Benzocaine Otic Solution* and *Neomycin and Polymyxin B Sulfates and Hydrocortisone Otic Solution*.

**Ophthalmic Solutions** (See *Ophthalmic Preparations*.)

**Spirits**—Spirits are alcoholic or hydroalcoholic solutions of volatile substances prepared usually by simple solution or by admixture of the ingredients. Some spirits serve as flavoring agents while others have medicinal value. Reduction of the high alcoholic content of spirits by admixture with aqueous preparations often causes turbidity.

Spirits require storage in tight, light-resistant containers to prevent loss by evaporation and to limit oxidative changes.

**Tinctures**—Tinctures are alcoholic or hydroalcoholic solutions prepared from vegetable materials or from chemical substances.

The proportion of drug represented in the different chemical tinctures is not uniform but varies according to the established standards for each. Traditionally, tinctures of potent vegetable drugs essentially represent the activity of 10 g of the drug in each 100 mL of tincture, the potency being adjusted following assay. Most other vegetable tinctures represent 20 g of the respective vegetable material in each 100 mL of tincture.

*Process P*—Carefully mix the ground drug or mixture of drugs with a sufficient quantity of the prescribed solvent or solvent mixture to render it evenly and distinctly damp, allow it to stand for 15 minutes, transfer it to a suitable percolator, and pack the drug firmly. Pour on enough of the prescribed solvent or solvent mixture to saturate the drug, cover the top of the percolator and, when the liquid is about to drip from the percolator, close the lower orifice, and allow the drug to macerate for 24 hours or for the time specified in the monograph. If no assay is directed, allow the percolation to proceed slowly, or at the specified rate, gradually adding sufficient solvent or solvent mixture to produce 1000 mL of tincture, and mix (for definitions of flow rates, see under *Fluidextracts*). If an assay is directed, collect only 950 mL of percolate, mix this, and assay a portion of it as directed. Dilute the remainder with such quantity of the prescribed solvent or solvent mixture as calculation from the assay indicates is necessary to produce a tincture that conforms to the prescribed standard, and mix.

*Process M*—Macerate the drug with 750 mL of the prescribed solvent or solvent mixture in a container that can be closed, and put in a warm place. Agitate it frequently during 3 days or until the soluble matter is dissolved. Transfer the mixture to a filter, and when most of the liquid has drained away, wash the residue on the filter with a sufficient quantity of the prescribed solvent

or solvent mixture, combining the filtrates, to produce 1000 mL of tincture, and mix.

Tinctures require storage in tight, light-resistant containers, away from direct sunlight and excessive heat.

**Waters, Aromatic**—Aromatic waters are clear, saturated aqueous solutions (unless otherwise specified) of volatile oils or other aromatic or volatile substances. Their odors and tastes are similar, respectively, to those of the drugs or volatile substances from which they are prepared, and they are free from empyreumatic and other foreign odors. Aromatic waters may be prepared by distillation or solution of the aromatic substance, with or without the use of a dispersing agent.

Aromatic waters require protection from intense light and excessive heat.

## Suppositories

Suppositories are solid bodies of various weights and shapes, adapted for introduction into the rectal, vaginal, or urethral orifice of the human body. They usually melt, soften, or dissolve at body temperature. A suppository may act as a protectant or palliative to the local tissues at the point of introduction or as a carrier of therapeutic agents for systemic or local action. Suppository bases usually employed are cocoa butter, glycerinated gelatin, hydrogenated vegetable oils, mixtures of polyethylene glycols of various molecular weights, and fatty acid esters of polyethylene glycol.

The suppository base employed has a marked influence on the release of the active ingredient incorporated in it. While cocoa butter melts quickly at body temperature, it is immiscible with body fluids and this inhibits the diffusion of fat-soluble drugs to the affected sites. Polyethylene glycol is a suitable base for some antiseptics. In cases where systemic action is expected, it is preferable to incorporate the ionized rather than the nonionized form of the drug, in order to maximize bioavailability. Although unionized drugs partition out of water-miscible bases such as glycerinated gelatin and polyethylene glycol more readily, the bases themselves tend to dissolve very slowly and thus retard release in this manner. Oleaginous vehicles such as cocoa butter are seldom used in vaginal preparations because of the nonabsorbable residue formed, while glycerinated gelatin is seldom used rectally because of its slow dissolution. Cocoa butter is superior for allaying irritation, as in preparations intended for treating internal hemorrhoids.

**Cocoa Butter Suppositories**—Suppositories having cocoa butter as the base may be made by means of incorporating the finely divided medicinal substance into the solid oil at room temperature and suitably shaping the resulting mass, or by working with the oil in the melted state and allowing the resulting suspension to cool in molds. A suitable quantity of hardening agents may be added to counteract the tendency of some medicaments such as chloral hydrate and phenol to soften the base. It is important that the finished suppository melt at body temperature.

The approximate weights of suppositories prepared with cocoa butter are given below. Suppositories prepared from other bases vary in weight and generally are heavier than the weights indicated here.

*Rectal Suppositories* for adults are tapered at one or both ends and usually weigh about 2 g each.

*Vaginal Suppositories* are usually globular or oviform and weigh about 5 g each. They are made from water soluble or water miscible vehicles such as polyethylene glycol or glycerinated gelatin.

Suppositories with cocoa butter base require storage in well-closed containers, preferably at a temperature below 30° (controlled room temperature).

**Cocoa Butter Substitutes**—Fat-type suppository bases can be produced from a variety of vegetable oils, such as coconut or palm kernel, which are modified by esterification, hydrogenation, and fractionation to obtain products of varying composition and melting temperatures (e.g., *Hydrogenated Vegetable Oil* and *Hard Fat*). These products can be so designed as to reduce rancidity. At the same time, desired characteristics such as narrow intervals between melting and solidification temperatures, and melting ranges to accommodate various formulation and climatic conditions, can be built in.

**Glycerinated Gelatin Suppositories**—Medicinal substances may be incorporated into glycerinated gelatin bases by addition of the prescribed quantities to a vehicle consisting of about 70 parts of glycerin, 20 parts of gelatin, and 10 parts of water.

Glycerinated gelatin suppositories require storage in tight containers, preferably at a temperature below 35°.

**Polyethylene Glycol–Base Suppositories**—Several combinations of polyethylene glycols having melting temperatures that are above body temperature have been used as suppository bases. Inasmuch as release from these bases depends on dissolution rather than on melting, there are significantly fewer problems in preparation and storage than exist with melting-type vehicles. However, high concentrations of higher molecular weight polyethylene glycols may lengthen dissolution time, resulting in problems with retention. Labels on polyethylene glycol suppositories should contain directions that they be moistened with water before inserting. Although they can be stored without refrigeration, they should be packaged in tightly closed containers.

**Surfactant Suppository Bases**—Several nonionic surface-active agents closely related chemically to the polyethylene glycols can be used as suppository vehicles. Examples of such surfactants are polyoxyethylene sorbitan fatty acid esters and the polyoxyethylene stearates. These surfactants are used alone or in combination with other suppository vehicles to yield a wide range of melting temperatures and consistencies. One of the major advantages of such vehicles is their water-dispersibility. However, care must be taken with the use of surfactants, because they may either increase the rate of drug absorption or interact with drug molecules, causing a decrease in therapeutic activity.

**Tableted Suppositories or Inserts**—Vaginal suppositories occasionally are prepared by the compression of powdered materials into a suitable shape. They are prepared also by encapsulation in soft gelatin.

## Suspensions

Suspensions are liquid preparations which consist of solid particles dispersed throughout a liquid phase in which the particles are not soluble. Dosage forms officially categorized as Suspensions are designated as such if they are not included in other more specific categories of suspensions, such as Oral Suspensions, Topical Suspensions, etc. (see these other categories). Some suspensions are prepared and ready for use, while others are prepared as solid mixtures intended for constitution just before use with an appropriate vehicle. Such products are designated "for Oral Suspension," etc. The term, Milk, is sometimes used for suspensions in aqueous vehicles intended for oral administration, e.g., *Milk of Magnesia*. The term, Magma, is often used to describe suspensions of inorganic solids such as clays, in water, where there is a tendency for strong hydration and aggregation of the solid, giving rise to gel-like consistency and thixotropic rheological behavior, e.g., *Bentonite Magma*. The term "Lotion" has been used to categorize many topical suspensions and emulsions intended for application to the skin, e.g., *Calamine Lotion*. Some suspensions are prepared in sterile form and are used as Injectables, as well as for ophthalmic and otic administration. These may be of two types, ready to use or intended for constitution with a prescribed amount of Water for Injection or other suitable diluent before use by the designated route. Suspensions should not be injected intravenously or intrathecally.

Suspensions intended for any route of administration should contain suitable antimicrobial agents to protect against bacteria, yeast, and mold contamination (see *Emulsions* for some consideration of antimicrobial preservative properties which apply also to Suspensions). By its very nature, the particular matter in a suspension may settle or sediment to the bottom of the container upon standing. Such sedimentation may also lead to caking and solidification of the sediment with a resulting difficulty in redispersing the suspension upon agitation. To prevent such problems, suitable ingredients which increase viscosity and the gel state of the suspension, such as clays, surfactants, polyols, polymers, or sugars, should be added. It is important that suspensions always be shaken well before use to ensure uniform distribution of the solid in the vehicle, thereby ensuring uniform and proper dosage. Suspensions require storage in tight containers.

**Oral Suspensions**—Oral Suspensions are liquid preparations containing solid particles dispersed in a liquid vehicle, with suitable flavoring agents, intended for oral administration. Some

[redacted]

suspensions labeled as Milks or Magmas fall into this category.

**Topical Suspensions**—Topical Suspensions are liquid preparations containing solid particles dispersed in a liquid vehicle, intended for application to the skin. Some suspensions labeled as Lotions fall into this category.

**Otic Suspensions**—Otic Suspensions are liquid preparations containing micronized particles intended for instillation in the outer ear.

**Ophthalmic Suspensions**—(See *Ophthalmic Preparations*).

## Syrups

See *Solutions*

## Systems

In recent years, a number of dosage forms have been developed using modern technology that allows for the uniform release or targeting of drugs to the body. These products are commonly called delivery systems. The most widely used of these are Transdermal Systems.

**Transdermal Systems**—Transdermal drug delivery systems are self-contained, discrete dosage forms which, when applied to intact skin are designed to deliver the drug(s) through the skin to the systemic circulation. Systems typically comprise an outer covering (barrier), a drug reservoir which may have a rate controlling membrane, a contact adhesive applied to some or all parts of the system and the system/skin interface, and a protective liner which is removed before applying the system. The activity of these systems is defined in terms of the release rate of the drug(s) from the system. The total duration of drug release from the system and the system surface area may also be stated.

Transdermal drug delivery systems work by diffusion: the drug diffuses from the drug reservoir, directly or through the rate controlling membrane and/or contact adhesive if present, and then through the skin into the general circulation. Typically, modified-release systems are designed to provide drug delivery at a constant rate, such that a true steady state blood concentration is achieved and maintained until the system is removed. At that time, blood concentration declines at a rate consistent with the pharmacokinetics of the drug.

Transdermal drug delivery systems are applied to body areas consistent with the labeling for the product(s). As long as drug concentration at the system/skin interface remains constant, the amount of drug in the dosage form does not influence plasma concentrations. The functional lifetime of the system is defined by the initial amount of drug in the reservoir and the release rate from the reservoir.

[NOTE—Drugs for local rather than systemic effect are commonly applied to the skin embedded in glue on a cloth or plastic backing. These products are defined traditionally as plasters or tapes.]

**Ocular System**—Another type of system is the ocular system which is intended for placement in the lower conjunctival formix from which the drug diffuses through a membrane at a constant rate over a seven-day period (e.g., *Pilocarpine Ocular System*).

**Intrauterine System**—An intrauterine system, based on a similar principle but intended for release of drug over a much longer period of time, i.e., one year, is also available (e.g., *Progesterone Intrauterine Contraceptive System*).

## Tablets

Tablets are solid dosage forms containing medicinal substances with or without suitable diluents. They may be classed, according to the method of manufacture, as molded tablets or compressed tablets.

The vast majority of all tablets manufactured are made by compression, and compressed tablets are the most widely used dosage form in this country. Compressed tablets are prepared by the application of high pressures, utilizing steel punches and dies, to powders or granulations. Tablets can be produced in a wide variety of sizes, shapes, and surface markings, depending upon the design of the punches and dies. Capsule-shaped tablets are commonly referred to as caplets. Boluses are large tablets intended for veterinary use, usually for large animals.

Molded tablets are prepared by forcing dampened powders under low pressure into die cavities. Solidification depends upon crystal bridges built up during the subsequent drying process, and not upon the compaction force.

Tablet triturates are small, usually cylindrical, molded or compressed tablets. Tablet triturates were traditionally used as dispensing tablets in order to provide a convenient, measured quantity of a potent drug for compounding purposes. Such tablets are rarely used today. Hypodermic tablets are molded tablets made from completely and readily water-soluble ingredients and formerly were intended for use in making preparations for hypodermic injection. They are employed orally, or where rapid drug availability is required such as in the case of *Nitroglycerin Tablets*, sublingually.

Buccal tablets are intended to be inserted in the buccal pouch, and sublingual tablets are intended to be inserted beneath the tongue, where the active ingredient is absorbed directly through the oral mucosa. Few drugs are readily absorbed in this way, but for those that are (such as nitroglycerin and certain steroid hormones), a number of advantages may result.

Soluble, effervescent tablets are prepared by compression and contain, in addition to active ingredients, mixtures of acids (citric acid, tartaric acid) and sodium bicarbonate, which release carbon dioxide when dissolved in water. They are intended to be dissolved or dispersed in water before administration. Effervescent tablets should be stored in tightly closed containers, or moisture-proof packs, labeled to indicate that they are not to be swallowed directly.

### CHEWABLE TABLETS

Chewable tablets are intended to be chewed, producing a pleasant tasting residue in the oral cavity that is easily swallowed and does not leave a bitter or unpleasant after-taste. These tablets have been used in tablet formulations for children, especially multivitamin formulations, and for the administration of antacids and selected antibiotics. Chewable tablets are prepared by compression, usually utilizing mannitol, sorbitol, or sucrose as binders and fillers, and containing colors and flavors to enhance their appearance and taste.

### PREPARATION OF MOLDED TABLETS

Molded tablets are prepared from mixtures of medicinal substances and a diluent usually consisting of lactose and powdered sucrose in varying proportions. The powders are dampened with solutions containing high percentages of alcohol. The concentration of alcohol depends upon the solubility of the active ingredients and fillers in the solvent system and the desired degree of hardness of the finished tablets. The dampened powders are pressed into molds, removed, and allowed to dry. Molded tablets are quite friable and care must be taken in packaging and dispensing.

### FORMULATION OF COMPRESSED TABLETS

Most compressed tablets consist of the active ingredient and a diluent (filler), binder, disintegrating agent, and lubricant. Approved FD&C and D&C dyes or lakes (dyes adsorbed onto insoluble aluminum hydroxide), flavors, and sweetening agents may be present also. Diluents are added where the quantity of active ingredient is small or difficult to compress. Common tablet fillers include lactose, starch, dibasic calcium phosphate, and microcrystalline cellulose. Chewable tablets often contain sucrose, mannitol, or sorbitol as a filler. Where the amount of active ingredient is small, the overall tableting properties are in large measure determined by the filler. Because of problems encountered with bioavailability of hydrophobic drugs of low water-solubility, water-soluble diluents are used as fillers for these tablets.

Binders give adhesiveness to the powder during the preliminary granulation and to the compressed tablet. They add to the cohesive strength already available in the diluent. While binders may be added dry, they are more effective when added out of solution. Common binders include acacia, gelatin, sucrose, povidone, methylcellulose, carboxymethylcellulose, and hydrolyzed starch pastes. The most effective dry binder is microcrystalline cellulose, which is commonly used for this purpose in tablets prepared by direct compression.

A disintegrating agent serves to assist in the fragmentation of the tablet after administration. The most widely used tablet disintegrating agent is starch. Chemically modified starches and

cellulose, alginic acid, microcrystalline cellulose, and cross-linked povidone, are also used for this purpose. Effervescent mixtures are used in soluble tablet systems as disintegrating agents. The concentration of the disintegrating agent, method of addition, and degree of compaction play a role in effectiveness.

Lubricants reduce friction during the compression and ejection cycle. In addition, they aid in preventing adherence of tablet material to the dies and punches. Metallic stearates, stearic acid, hydrogenated vegetable oils, and talc are used as lubricants. Because of the nature of this function, most lubricants are hydrophobic, and as such tend to reduce the rates of tablet disintegration and dissolution. Consequently, excessive concentrations of lubricant should be avoided. Polyethylene glycols and some lauryl sulfate salts have been used as soluble lubricants, but such agents generally do not possess optimal lubricating properties, and comparatively high concentrations are usually required.

Glidants are agents that improve powder fluidity, and they are commonly employed in direct compression where no granulation step is involved. The most effective glidants are the colloidal pyrogenic silicas.

Colorants are often added to tablet formulations for esthetic value or for product identification. Both D&C and FD&C dyes and lakes are used. Most dyes are photosensitive and they fade when exposed to light. The federal Food and Drug Administration regulates the colorants employed in drugs.

### MANUFACTURE

Tablets are prepared by three general methods: wet granulation, dry granulation (roll compaction or slugging), and direct compression. The purpose of both wet and dry granulation is to improve flow of the mixture and/or to enhance its compressibility.

Dry granulation (slugging) involves the compaction of powders at high pressures into large, often poorly formed tablet compacts. These compacts are then milled and screened to form a granulation of the desired particle size. The advantage of dry granulation is the elimination of both heat and moisture in the processing. Dry granulations can be produced also by extruding powders between hydraulically operated rollers to produce thin cakes which are subsequently screened or milled to give the desired granule size.

Excipients are available that allow production of tablets at high speeds without prior granulation steps. These directly compressible excipients consist of special physical forms of substances such as lactose, sucrose, dextrose, or cellulose, which possess the desirable properties of fluidity and compressibility. The most widely used direct-compaction fillers are microcrystalline cellulose, anhydrous lactose, spray-dried lactose, compressible sucrose, and some forms of modified starches. Direct compression avoids many of the problems associated with wet and dry granulations. However, the inherent physical properties of the individual filler materials are highly critical, and minor variations can alter flow and compression characteristics so as to make them unsuitable for direct compression.

Physical evidence of poor tablet quality is discussed under *Stability Considerations in Dispensing Practice* ⟨1191⟩.

**Weight Variation and Content Uniformity**—Tablets are required to meet a weight variation test (see *Uniformity of Dosage Units* ⟨905⟩) where the active ingredient comprises a major portion of the tablet and where control of weight may be presumed to be an adequate control of drug content uniformity. Weight variation is not an adequate indication of content uniformity where the drug substance comprises a relatively minor portion of the tablet, or where the tablet is sugar-coated. Thus, the Pharmacopeia generally requires that coated tablets and tablets containing 50 mg or less of active ingredient, comprising less than 50% by weight of the dosage-form unit, pass a content uniformity test (see *Uniformity of Dosage Units* ⟨905⟩), wherein individual tablets are assayed for actual drug content.

**Disintegration and Dissolution**—Disintegration is an essential attribute of tablets intended for administration by mouth, except those intended to be chewed before being swallowed and except some types of extended-release tablets. A disintegration test is provided (see *Disintegration* ⟨701⟩), and limits on the times in which disintegration is to take place, appropriate for the types of tablets concerned, are given in the individual monographs.

For drugs of limited water-solubility, dissolution may be a more meaningful quality attribute than disintegration. A dissolution test (see *Dissolution* ⟨711⟩) is required in a number of monographs on tablets. In many cases, it is possible to correlate dissolution rates with biological availability of the active ingredient. However, such tests are useful mainly as a means of screening preliminary formulations and as a routine quality-control procedure.

### COATINGS

Tablets may be coated for a variety of reasons, including protection of the ingredients from air, moisture, or light, masking of unpleasant tastes and odors, improvement of appearance, and control of the site of drug release in the gastrointestinal tract.

**Plain Coated Tablets**—Classically, tablets have been coated with sugar applied from aqueous suspensions containing insoluble powders such as starch, calcium carbonate, talc, or titanium dioxide, suspended by means of acacia or gelatin. For purposes of identification and esthetic value, the outside coatings may be colored. The finished coated tablets are polished by application of dilute solutions of wax in solvents such as chloroform or powdered mix. Water-protective coatings consisting of substances such as shellac or cellulose acetate phthalate are often applied out of nonaqueous solvents prior to application of sugar coats. Excessive quantities should be avoided. Drawbacks of sugar coating include the lengthy time necessary for application, the need for waterproofing, which also adversely affects dissolution, and the increased bulk of the finished tablet. These factors have resulted in increased acceptance of film coatings. Film coatings consist of water-soluble or dispersible materials such as hydroxypropyl methylcellulose, methylcellulose, hydroxypropylcellulose, carboxymethylcellulose sodium, and mixtures of cellulose acetate phthalate and polyethylene glycols applied out of nonaqueous or aqueous solvents. Evaporation of the solvents leaves a thin film that adheres directly to the tablet and allows it to retain the original shape, including grooves or identification codes.

**Enteric-coated Tablets**—Where the drug may be destroyed or inactivated by the gastric juice or where it may irritate the gastric mucosa, the use of "enteric" coatings is indicated. Such coatings are intended to delay the release of the medication until the tablet has passed through the stomach. The term "delayed-release" is used for Pharmacopeial purposes, and the individual monographs include tests and specifications for *Drug release* (see *Drug Release* ⟨724⟩).

**Extended-release Tablets**—Extended-release tablets are formulated in such manner as to make the contained medicament available over an extended period of time following ingestion. Expressions such as "prolonged-action," "repeat-action," and "sustained-release" have been used also to describe such dosage forms. However, the term "extended-release" is used for Pharmacopeial purposes, and requirements for *Drug release* typically are specified in the individual monographs.

## ⟨1171⟩ PHASE-SOLUBILITY ANALYSIS

Phase-solubility analysis is the quantitative determination of the purity of a substance through the application of precise solubility measurements. At a given temperature, a definite amount of a pure substance is soluble in a definite quantity of solvent. The resulting solution is saturated with respect to the particular substance, but the solution remains unsaturated with respect to other substances, even though such substances may be closely related in chemical structure and physical properties to the particular substance being tested. Constancy of solubility, just as constancy of melting temperature or other physical properties, indicates that a material is pure or is free from foreign admixture except in the unique case where the percentage composition of the substance under test is in direct ratio to solubilities of the respective components. Conversely, variability of solubility indicates the presence of an impurity or impurities.

Phase-solubility analysis is applicable to all species of compounds that are crystalline solids and that form stable solutions. It is not readily applicable to compounds that form solid solutions with impurities.

The standard solubility method consists of six distinct steps: (1) mixing, in a series of separate systems, increasing quantities

that they are testing negative controls. Of these tests a false positive frequency not exceeding 2% is desirable.

For aseptically processed articles, these facts support the routine use of the test set forth under *Sterility Tests* ⟨71⟩ or a more elaborate one. The production and validation documentation should be acceptable and complete. For effectively terminally sterilized products, however, the lower microbial survivor probability may direct the use of a less extensive test than the compendial procedure specified under *Sterility Tests* ⟨71⟩, or even preclude the necessity altogether for performing one. This added reliability of sterility assurance of terminal sterilization depends upon a properly validated and documented sterilization process. Sterility testing alone is no substitute.

**Interpretation of Quality Control Tests**—The overall responsibility for the operation of the test unit and the interpretation of test results in relation to acceptance or rejection of a lot should be in the hands of those who have appropriate formal training in microbiology and have knowledge of industrial sterilization, aseptic processing, and the statistical concepts involved in sampling. These individuals should be knowledgeable also concerning the environmental control program in the test facility to assure that the microbiological quality of the air and critical work surfaces are consistently acceptable.

Quality control sterility tests (either according to the official referee test or modified tests) may be carried out in two separate stages in order to rule out false positive results. *First Stage.* Regardless of the sampling plan used, if no evidence of microbial growth is found, the results of the test may be taken as indicative of absence of intrinsic contamination of the lot.

If microbial growth is found, proceed to the *Second Stage* (unless the *First Stage* test can be invalidated). Evidence for invalidating a *First Stage* test in order to repeat it as a *First Stage* test may be obtained from a review of the testing environment and the relevant records thereto. Finding of microbial growth in negative controls need not be considered the sole grounds for invalidating a *First Stage* test. When proceeding to the *Second Stage*, particularly where depending on the results of the test for lot release, concurrently, initiate and document a complete review of all applicable production and control records. In this review consideration should be paid to the following: (1) a check on monitoring records of the validated sterilization cycle applicable to the product; (2) sterility test history relating to the particular product for both finished and in-process samples, as well as sterilization records of supporting equipment, containers/closures, and sterile components, if any; (3) environmental control data, including those obtained from media fills, exposure plates, filtering records, any sanitization records and microbial monitoring records of operators, gowns, gloves, and garbing practices.

Failing any lead from the above review, the current microbial profile of the product should be checked against the known historical profile for possible change. Records should be checked concomitantly for any changes in source of product components and/or in-processing procedures that might be contributory. Depending on the findings, and in extreme cases, consideration may have to be given to re-validation of the total manufacturing process. For the *Second Stage* it is not possible to specify a particular number of specimens to be taken for testing. It is usual to select double the number specified for the *First Stage* under *Sterility Tests* ⟨71⟩, or other reasonable number. The minimum volumes tested from each specimen, the media, and the incubation periods are the same as those indicated for the *First Stage.*

If no microbial growth is found in the *Second Stage*, and the documented review of appropriate records and the indicated product investigation does not support the possibility of intrinsic contamination, the lot may meet the requirements of a test for sterility. If growth is found, the lot fails to meet the requirements of the test. As was indicated for the *First Stage* test, the *Second Stage* test may similarly be invalidated with appropriate evidence, and, if so done, repeated as a *Second Stage* test.

# ⟨1221⟩ TEASPOON

For household purposes, an American Standard Teaspoon has been established by the American National Standards Institute* as containing 4.93 ± 0.24 mL. In view of the almost universal practice of employing teaspoons ordinarily available in the household for the administration of medicine, the teaspoon may be regarded as representing 5 mL. Preparations intended for administration by teaspoon should be formulated on the basis of dosage in 5-mL units. Any dropper, syringe, medicine cup, special spoon, or other device used to administer liquids should deliver 5 mL wherever a teaspoon calibration is indicated. Under ideal conditions of use, the volume error incurred in measuring liquids for individual dose administration by means of such calibrated devices should be not greater than 10% of the indicated amount.

Household units are used often to inform the patient of the size of the dose. Fifteen milliliters should be considered 1 standard tablespoonful; 10 mL, 2 standard teaspoonfuls; and 5 mL, 1 standard teaspoonful. Doses of less than 5 mL are frequently stated as fractions of a teaspoonful or in drops.

Because of the difficulties involved in measuring liquids under normal conditions of use, patients should be cautioned that household spoons are not appropriate for measuring medicines. They should be directed to use the standard measures in the cooking-and-baking measuring spoon sets or, preferably, oral dosing devices that may be provided by the practitioner. It must be kept in mind that the actual volume of a spoonful of any given liquid is related to the latter's viscosity and surface tension, among other influencing factors. These factors can also cause variability in the true volumes contained in or delivered by medicine cups. Where accurate dosage is required, a calibrated syringe or dropper should be used.

* American National Standards Institute, 1430 Broadway, New York, NY 10018.

# ⟨1225⟩ VALIDATION OF COMPENDIAL METHODS

Test procedures for assessment of the quality levels of pharmaceutical products are subject to various requirements. According to Section 501 of the Federal Food, Drug, and Cosmetic Act, assays and specifications in monographs of the United States Pharmacopeia and the National Formulary constitute legal standards. The Current Good Manufacturing Practice regulations [21 CFR 211.194(a)] require that test methods, which are used for assessing compliance of pharmaceutical products with established specifications, must meet proper standards of accuracy and reliability. Also, according to these regulations [21 CFR 211.194(a)(2)], users of analytical methods described in the USP and the NF are not required to validate accuracy and reliability of these methods, but merely verify their suitability under actual conditions of use. Recognizing the legal status of USP and NF standards, it is essential, therefore, that proposals for adoption of new or revised compendial analytical methods be supported by sufficient laboratory data to document the validity of these procedures.

## Submissions to the Compendia

Submissions to the compendia for new or revised analytical methods should contain sufficient information to enable members of the USP Committee of Revision to evaluate the relative merit of proposed procedures. In most cases, evaluations involve assessment of the clarity and completeness of the description of the analytical methods, determination of the need for the methods, and documentation that the methods have been appropriately validated. Information may vary depending upon the type of assay involved. However, in most cases a submission will consist of the following sections.

**Rationale**—This section should identify the need for the assay and describe the capability of the specific method proposed and why it is preferred over other types of determinations. For revised procedures, a comparison should be provided of limitations of the current compendial assay and advantages offered by the proposed method.

**Proposed Analytical Method**—This section should contain a complete description of the analytical method sufficiently detailed to enable persons "skilled in the art" to replicate it. The write-up should include all important operational parameters and

specific instructions such as preparation of reagents, performance of systems suitability tests, precautions, and explicit formulas for calculation of test results.

**Data Elements**—This section should provide thorough and complete documentation of the validation of the analytical method. It should include summaries of experimental data and calculations substantiating each of the applicable analytical performance parameters. These parameters are described in the following section.

## Validation

Validation of an analytical method is the process by which it is established, by laboratory studies, that the performance characteristics of the method meet the requirements for the intended analytical applications. Performance characteristics are expressed in terms of analytical parameters. Typical analytical parameters that should be considered in the validation of the types of assays described in this document are listed in Table 1. Since opinions may differ with respect to terminology and use, each of the parameters is defined in the next section of this chapter along with a delineation of a typical method by which it may be measured.

**Table 1. Typical Analytical Parameters Used in Assay Validation.**

| |
|---|
| Precision |
| Accuracy |
| Limit of Detection |
| Limit of Quantitation |
| Selectivity |
| Range |
| Linearity |
| Ruggedness |

### ANALYTICAL PERFORMANCE PARAMETERS

**Precision**—

*Definition*—The precision of an analytical method is the degree of agreement among individual test results when the procedure is applied repeatedly to multiple samplings of a homogeneous sample. The precision of an analytical method is usually expressed as the standard deviation or relative standard deviation (coefficient of variation). Precision is a measure of the degree of reproducibility of the analytical method under normal operating circumstances.

*Determination*—The precision of an analytical method is determined by assaying a sufficient number of aliquots of a homogeneous sample to be able to calculate statistically valid estimates of standard deviation or relative standard deviation (coefficient of variation). Assays in this context are independent analyses of samples that have been carried through the complete analytical procedure from sample preparation to final test result.

**Accuracy**—

*Definition*—The accuracy of an analytical method is the closeness of test results obtained by that method to the true value. Accuracy may often be expressed as percent recovery by the assay of known, added amounts of analyte. Accuracy is a measure of the exactness of the analytical method.

*Determination*—The accuracy of an analytical method may be determined by applying that method to samples or mixtures of excipients to which known amounts of analyte have been added both above and below the normal levels expected in the samples. The accuracy is then calculated from the test results as the percentage of analyte recovered by the assay.

**Limit of Detection**—

*Definition*—The limit of detection is a parameter of limit tests. It is the lowest concentration of analyte in a sample that can be detected, but not necessarily quantitated, under the stated experimental conditions. Thus, limit tests merely substantiate that the analyte concentration is above or below a certain level. The limit of detection is usually expressed as the concentration of analyte (e.g., percentage, parts per billion) in the sample.

*Determination*—Determination of the limit of detection of an analytical method will vary depending on whether it is an instrumental or a noninstrumental procedure. For instrumental procedures, different techniques may be used. Some investigators determine the signal-to-noise ratio by comparing test results from samples with known concentrations of analyte with those of blank samples and establish the minimum level at which the analyte can be reliably detected. A signal-to-noise ratio of 2:1 or 3:1 is generally accepted. Other investigators measure the magnitude of analytical background response by analyzing a number of blank samples and calculating the standard deviation of this response. The standard deviation multiplied by a factor, usually 2 or 3, provides an estimate of the limit of detection. This limit is subsequently validated by the analysis of a suitable number of samples known to be near or prepared at the limit of detection.

For noninstrumental methods, the limit of detection is generally determined by the analysis of samples with known concentrations of analyte and by establishing the minimum level at which the analyte can be reliably detected.

**Limit of Quantitation**—

*Definition*—Limit of quantitation is a parameter of quantitative assays for low levels of compounds in sample matrices, such as impurities in bulk drug substances and degradation products in finished pharmaceuticals. It is the lowest concentration of analyte in a sample that can be determined with acceptable precision and accuracy under the stated experimental conditions. The limit of quantitation is expressed as the concentration of analyte (e.g., percentage, parts per billion) in the sample.

*Determination*—Determination of the limit of quantitation of an analytical method may vary depending on whether it is an instrumental or a noninstrumental procedure. For instrumental procedures, a common approach is to measure the magnitude of analytical background response by analyzing a number of blank samples and calculating the standard deviation of this response. The standard deviation multiplied by a factor, usually 10, provides an estimate of the limit of quantitation. This limit is subsequently validated by the analysis of a suitable number of samples known to be near or prepared at the limit of quantitation.

For noninstrumental methods, the limit of quantitation is generally determined by the analysis of samples with known concentrations of analyte and by establishing the minimum level at which the analyte can be detected with acceptable accuracy and precision.

**Selectivity**—

*Definition*—The selectivity (also termed specificity) of an analytical method is its ability to measure accurately and specifically the analyte in the presence of components that may be expected to be present in the sample matrix. Selectivity may often be expressed as the degree of bias of test results obtained by analysis of samples containing added impurities, degradation products, related chemical compounds, or placebo ingredients when compared to test results from samples without added substances. The bias may be expressed as the difference in assay results between the two groups of samples. Selectivity is a measure of the degree of interference (or absence thereof) in the analysis of complex sample mixtures.

*Determination*—The selectivity of an analytical method is determined by comparing test results from the analysis of samples containing impurities, degradation products, or placebo ingredients with those obtained from the analysis of samples without impurities, degradation products, or placebo ingredients. The bias of the assay, if any, is the difference in test results between the two groups of samples.

When impurities or degradation products are unidentified or unavailable, selectivity may be demonstrated by analysis by the method in question of samples containing impurities or degradation products and comparing the results to those from additional purity assays (e.g., chromatographic assay, phase solubility, differential scanning calorimetry). The degree of agreement of test results is a measure of the selectivity.

**Linearity and Range**—

*Definition of Linearity*—The linearity of an analytical method is its ability to elicit test results that are directly, or by a well-defined mathematical transformation, proportional to the concentration of analyte in samples within a given range. Linearity is usually expressed in terms of the variance around the slope of the regression line calculated according to an established mathematical relationship from test results obtained by the analysis of samples with varying concentrations of analyte.

*Definition of Range*—The range of an analytical method is the interval between the upper and lower levels of analyte (including these levels) that have been demonstrated to be determined with precision, accuracy, and linearity using the method as written. The range is normally expressed in the same units as test results (e.g., percent, parts per million) obtained by the analytical method.

*Determination of Linearity and Range*—The linearity of an analytical method is determined by mathematical treatment of test results obtained by analysis of samples with analyte concentrations across the claimed range of the method. The treatment is normally a calculation of a regression line by the method of least squares of test results versus analyte concentrations. In some cases, to obtain proportionality between assays and sample concentrations, the test data may have to be subjected to a mathematical transformation prior to the regression analysis. The slope of the regression line and its variance provide a mathematical measure of linearity; the y-intercept is a measure of the potential assay bias. Plotting the test results graphically as a function of analyte concentration on appropriate graph paper may be an acceptable alternative to the regression line calculation.

The range of the method is validated by verifying that the analytical method provides acceptable precision, accuracy, and linearity when applied to samples containing analyte at the extremes of the range as well as within the range.

**Ruggedness**—

*Definition*—The ruggedness of an analytical method is the degree of reproducibility of test results obtained by the analysis of the same samples under a variety of normal test conditions, such as different laboratories, different analysts, different instruments, different lots of reagents, different elapsed assay times, different assay temperatures, different days, etc. Ruggedness is normally expressed as the lack of influence on test results of operational and environmental variables of the analytical method. Ruggedness is a measure of reproducibility of test results under normal, expected operational conditions from laboratory to laboratory and from analyst to analyst.

*Determination*—The ruggedness of an analytical method is determined by analysis of aliquots from homogeneous lots in different laboratories, by different analysts, using operational and environmental conditions that may differ but are still within the specified parameters of the assay. The degree of reproducibility of test results is then determined as a function of the assay variables. This reproducibility may be compared to the precision of the assay under normal conditions to obtain a measure of the ruggedness of the analytical method.

### DATA ELEMENTS REQUIRED FOR ASSAY VALIDATION

Compendial assay procedures vary from highly exacting analytical determinations to subjective evaluation of attributes. Considering this variety of assays, it is only logical that different test methods require different validation schemes. This chapter covers only the most common categories of assays for which validation data should be required. These categories are as follows:

**Category I**—Analytical methods for quantitation of major components of bulk drug substances or active ingredients (including preservatives) in finished pharmaceutical products fall under Category I.

**Category II**—Analytical methods for determination of impurities in bulk drug substances or degradation compounds in finished pharmaceutical products are in Category II. These methods include quantitative assays and limit tests.

**Category III**—Analytical methods for determination of performance characteristics (e.g., dissolution, drug release) are considered Category III.

For each assay category, different analytical information is needed. Listed in Table 2 are data elements that are normally required for each of the categories of assays.

Already established general assays and tests (e.g., titrimetric method of water determination, bacterial endotoxins test) should also be validated to verify their accuracy (and absence of possible interference) when used for a new product or raw material.

The validity of an analytical method can be verified only by laboratory studies. Therefore, documentation of the successful completion of such studies is a basic requirement for determining whether a method is suitable for its intended applications. Appropriate documentation should accompany any proposal for new or revised compendial analytical procedures.

## ⟨1231⟩ WATER FOR PHARMACEUTICAL PURPOSES

Water is the most copiously and widely used substance in pharmaceutical manufacturing. Control of the chemical and microbiological quality of water for pharmaceutical purposes is difficult because its basic sources—municipal and non-municipal water systems—are influenced by many factors.

Monitoring of quality parameters in source water is necessary to ensure an acceptable water supply.

Water is required for a variety of purposes ranging from the needs of manufacturing processes to the final preparation of therapeutic agents just prior to their administration to patients.

Drinking water, which is subject to federal Environmental Protection Agency regulations and which is delivered by the municipal or other local public system or drawn from a private well or reservoir, is the starting material for most forms of water covered by Pharmacopeial monographs. Water prepared from other starting material may have to be processed to meet drinking water standards. Drinking water may be used in the preparation of USP drug substances but not in the preparation of dosage forms, or in the preparation of reagents or test solutions.

The Pharmacopeia provides several monographs for water. Of these, *Purified Water* and *Water for Injection* represent ingredient materials, while the other monographs for water provide standards for compendial pharmaceutical articles in themselves.

**Purified Water** (see USP monograph)—This article represents water rendered suitable for pharmaceutical purposes by processes such as distillation, ion-exchange treatment (deionization or demineralization), or reverse osmosis. It meets rigid specifications for chemical purity, the requirements of the federal Environmental Protection Agency with respect to drinking water, and it contains no added substances. However, the various methods of production each present different potential for contaminating products. Purified Water produced by distillation is sterile, provided the production equipment is suitable and is sterile. On the other hand, ion-exchange columns and reverse osmosis units re-

**Table 2. Data Elements Required for Assay Validation.**

| Analytical Performance Parameter | Assay Category I | Assay Category II: Quantitative | Assay Category II: Limit Tests | Assay Category III |
|---|---|---|---|---|
| Precision | Yes | Yes | No | Yes |
| Accuracy | Yes | Yes | * | * |
| Limit of Detection | No | No | Yes | * |
| Limit of Quantitation | No | Yes | No | * |
| Selectivity | Yes | Yes | Yes | * |
| Range | Yes | Yes | * | * |
| Linearity | Yes | Yes | No | * |
| Ruggedness | Yes | Yes | Yes | Yes |

* May be required, depending on the nature of the specific test.

[redacted]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT LABORATORIES and ABBOTT RESPIRATORY LLC, | ) | |
| Plaintiffs, | ) | C.A. No. 09-152 (JJF)(LPS) |
| v. | ) | |
| LUPIN LIMITED and LUPIN PHARMACEUTICALS, INC., | ) | |
| Defendants. | ) | |

**PLAINTIFFS' ANSWERING CLAIM CONSTRUCTION BRIEF**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
mgraham@mnat.com
*Attorneys for Abbott Laboratories and Abbott Respiratory LLC*

OF COUNSEL:

William F. Lee
Hollie L. Baker
Vinita Ferrera
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

March 29, 2010

Pharmacopeia ("USP").[18] The Federal Circuit has explained that extrinsic evidence such as this is generally viewed as "less reliable than the patent and its prosecution history in determining how to read claim terms," and therefore "undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the indisputable public records consisting of the claims, the specification and the prosecution history, thereby undermining the public notice function of patents." *Phillips*, 415 F.3d at 1318-1319 (internal quotations and citations omitted). Lupin uses the USP to do precisely what the Federal Circuit has cautioned against—that is, to narrow the meaning of "about" in such a way that is not supported by the claims, specifications, or prosecution histories of the Kos Patents.

Lupin argues that its reliance on the USP in this case is justified because the specifications and claims of some of the Kos Patents refer to the USP for some purposes. (Defs.' Br. at 30-32.) However, the inventors' discrete references to the USP are limited to a specific aspect of the claims of two of the patents, and in no way suggest that every time the inventors used "about" in the claims they intended to reference the USP. In particular, the specifications of the '229, '715, '691, and '967 patents each include ***a single reference*** to the USP: "Each nicotinic acid formulation of the instant invention will typically exhibit the following dissolution profile ***in U.S.P. XXIII, Apparatus I***, 900 mls of deionized water at 37° C., baskets at 100 RPM, as indicated in Table 3." (*See, e.g.*, JA000119, '229 patent, 9:13-16 (emphasis added).) In addition, the claims of the '691 and '967 patents reference the USP in connection with the same "type I dissolution apparatus." (*See* JA000100-01, '691 patent, claims 1, 13 (referring to "a type

[18] The USP is a non-governmental, official public standards-setting authority, which sets and publishes quality, purity, strength, and consistency standards, as well as verification standards, for drugs listed in the USP-National Formulary, a book of public pharmacopeial standards. (AA Ex. E, Supp. Foster Decl., ¶ 8.) The USP sets standards for the quality, purity, strength, and consistency of prescription and over-the-counter medicines, other health care products, food ingredients, and dietary supplements. (*Id.*)

I dissolution apparatus (basket) according to U.S. Pharmacopeia XXII"); JA000073-74, '967 patent, claims 1, 16 (same).)[19] There is no reference to the USP in connection with any other aspect of the claims. As such, nothing would suggest to one of ordinary skill in the art that the other "about" terms—which bear no relation to the USP-defined "type I dissolution apparatus"—should be construed according to the guidelines set out in the USP. (AA Ex. E, Supplemental Declaration of Thomas S. Foster ("Supp. Foster Decl."), ¶ 15.) In fact, the inventors' citation to the USP in the specific context of the dissolution testing apparatus demonstrates that the inventors were aware of the USP and yet knowingly chose not to reference USP standards to define "about" in any other context.

Moreover, most of the uses of "about" to which Lupin attempts to apply the USP relate to parameters that the USP does not govern. (*Id.* at ¶ 16-28.) As explained in the Supplemental Declaration of Dr. Thomas S. Foster, who is a Member of the USP, and contrary to Lupin's assertion in its brief, the USP is ***not*** the "official public standards-setting authority for all prescription and over-the-counter medicines . . . manufactured and sold in the United States." (*See* Defs.' Br. at 31 (emphasis added); AA Ex. E, Supp. Foster Decl., ¶ 7.) Rather, the USP sets performance standards for ***in vitro*** parameters to ensure the quality of medicines, including

[19] Lupin points to Abbott's reference to the tolerances set forth in the USP for use of such a "type I dissolution apparatus" as evidence that reliance on the USP for all of the "about" terms is appropriate. However, Abbott's reliance on the USP for the unique purpose of construing "about __ hours" in the '967 and '691 patents is consistent with the limited reference to the USP in the claims. As noted above, the claims refer to measuring an *in vitro* dissolution profile "in a type I dissolution apparatus (basket) according to U.S. Pharmacopeia XXII." (JA000100-01, '691 patent, claims 1, 13; JA000073-74, '967 patent, claims 1, 16.) The pertinent section of the USP states that "[i]f two or more times are specified, specimens are to be withdrawn [from the dissolution testing apparatus] only at the stated times, within a tolerance of ± 2%." (*See* LA000004, USP XXII § 721, at 1579.) Thus, the phrase "about __ hours" clearly describes the parameters for the use of the USP's "type I dissolution apparatus." (AA Ex. E, Supp. Foster Decl., ¶ 14.) Where the inventors expressly pegged this particular claim parameter to the USP, a skilled artisan would have understood to look to the USP ***in this specific context***. (*Id.* at ¶¶ 14-15.)

**CERTIFICATE OF SERVICE**

I hereby certify that on March 29, 2010, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered participants.

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on March 29, 2010 upon the following individuals in the manner indicated:

**BY E-MAIL AND HAND DELIVERY**

Karen L. Pascale, Esq.
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

**kpascale@ycst.com**

**BY E-MAIL**

Kevin F. Murphy, Esq.
FROMMER LAWRENCE & HAUG LLP
**kmurphy@flhlaw.com**

Michael F. Brockmeyer, Esq.
FROMMER LAWRENCE & HAUG LLP
**mbrockmeyer@flhlaw.com**

Barry S. White, Esq.
FROMMER LAWRENCE & HAUG LLP
**bwhite@flhlaw.com**

Steven M. Amundson, Esq.
FROMMER LAWRENCE & HAUG LLP
**samundson@flhlaw.com**

*/s/ Mary B. Graham*

Mary B. Graham (#2256)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ABBOTT LABORATORIES and ABBOTT RESPIRATORY LLC,<br><br>Plaintiffs,<br><br>v.<br><br>LUPIN LIMITED and LUPIN PHARMACEUTICALS, INC.,<br><br>Defendants. | ) | C.A. No. 09-152-JJF |

**SUPPLEMENTAL DECLARATION OF THOMAS S. FOSTER, PHARM.D. IN SUPPORT OF PLAINTIFFS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**

## I. INTRODUCTION

1. I am the same Thomas S. Foster, Pharm.D. who submitted a March 1, 2010 Declaration in support of the Opening Claim Construction Brief of Plaintiffs Abbott Laboratories and Abbott Respiratory LLC (collectively, "Plaintiffs" or "Abbott").

2. In addition to the materials I reviewed in connection with my March 1, 2010 Declaration, I also have reviewed Lupin's Opening Claim Construction Brief ("Defs. Br.") and the supporting declarations of Dr. Wharton and Dr. Taft.

3. I understand that Lupin proposes that the term "about" in the '229, '715, '967, and '691 patents should be defined according to strict numerical limitations. Specifically, Lupin proposes that:

a) in measurements of the effective amount of active ingredient in a tablet, "[at least] about ___ mg" refers to the recited amount with a variance of up to 15% (Defs.' Br. at 30);

b) in measurements of blood plasma concentration (Cmax, Tmax, and AUC), "about" refers to the stated number ± 10% (Defs.' Br. at 34-35);

15. None of the measurements of the other "about" terms at issue in the '229, '715, '967, or '691 patents bear any relation to the USP-defined "type I dissolution apparatus." Therefore, in my opinion, a person of skill in the art would not have looked to the USP to define "about" in the context of these other terms.

## V. DISPUTED TERMS

### A. "Dissolution Profile" Limitations ('691 and '967 patents)

16. The '691 patent claims an "intermediate release nicotinic acid formulation" having a dissolution profile that closely matches the unique dissolution profile of NIASPAN®. (JA000091-92, JA000101, '691 patent, claim 13.) More specifically, the '691 patent describes the concept of a fit factor ($F_2$) that measures the similarity of a test dissolution profile to the profile of NIASPAN®. The $F_2$ value is useful as a surrogate in predicting whether the test profile is bioequivalent to NIASPAN®. (JA000092, '691 patent, 11:12-67, Tables 6-7.)

17. The '967 patent claims a "method of reducing flushing in an individual being treated for a lipidemic disorder and effectively treating the lipidemic disorder" using the "intermediate release nicotinic acid formulation" of the '691 patent. (JA000074, '967 patent, claim 16.)

18. I understand Lupin defines "about__%" in the context of determining the test dissolution profile as the stated percentage ± 10%. (Defs.' Br. at 40.) I understand Lupin bases this proposed definition on the USP's language in the "General Notices" section that "[i]n stating the appropriate quantities to be taken for assays and tests, the use of the word 'about' indicates a quantity within 10 percent of the specified weight or volume." (LA000003, USP XXII, at 6; LA000008, USP XXIII, at 8.)

19. In my opinion, a person of ordinary skill in the art would not have looked at this section of the USP in defining the "about __ %" parameters of the '967 and '691 patents. As explained above, the NIASPAN® drug product has never been the subject of any USP monograph. Therefore, the USP's reference standards and guidelines are not applicable to NIASPAN® or to the patents.

**B. Effective Amount of Active Ingredient ('229, '715, and '967 patents)**

20. I understand Lupin proposes that the terms "at least about __ mg" and "about __ mg," as used in the claims of the '229, '715, and '967 patents mean "no less than 85% of __ mg" and "no less than 85% of __ mg and no more than 115% of __ mg," respectively.

21. Lupin asserts that the USP versions in effect at the time of the inventions "reflect ordinary and customary meaning at the time of the invention." (Defs.' Br. at 31.) As explained above, the USP does not impose a set of standards to be applied universally to all measurements involving drugs. Rather, the USP defines reference standards and general guidelines for monographed drugs. USP standards are not applicable to non-monographed drugs, such as NIASPAN®.

22. I understand that, in support of its proposed definition, Lupin relies on the section of the USP concerning "content uniformity," or the consistency in the amount of active pharmaceutical ingredient in a given drug ***across batches*** of that drug. This standard is intended to ensure that all doses of a particular drug product contain approximately the same amount of the drug. The section of the USP is not relevant to the parameter being claimed in the '229, '715, and '967 patents, which describe the amount of active ingredient necessary in a tablet to achieve a desired result. In my opinion, therefore, a person of ordinary skill in the art would not

have looked at this section of the USP in attempting to understand the meaning of "at least about __ mg" or "about __ mg" as used in the '229, '715, and '967 patents.

23. In addition, in my opinion, even if the content uniformity section of the USP were relevant to understanding "at least about __ mg" and "about __ mg" as used in the patents, the section of the USP that one of skill in the art would first look to is the USP monograph on "niacin," which lists a tolerance of ± 10%, not the "catch-all" provision for dosage forms that are not otherwise addressed specifically in the USP. (AA Ex. 12, USP XXIV, at 1177.)

**C. Blood Plasma Concentration/Urinary Metabolite Profile Parameters ('229 and '715 patents)**

24. The '715 patent claims an "intermediate release nicotinic acid formulation" having a unique and distinctive urinary metabolite profile that achieves a balance between immediate release niacin and sustained release niacin. (JA000048-49, '715 patent, claims 1, 3, 5, 7, 9, 11)

25. The '229 patent claims an "intermediate release nicotinic acid formulation" exhibiting unique pharmacokinetic properties measured in terms of Cmax (peak concentration after administration of the drug), Tmax (time when Cmax is achieved), and AUC (representing the extent of absorption of the drug). (JA000129, '229 patent, claims 17, 25.)

26. I understand Lupin bases its proposed definition of "about" in the context of these claims on the USP's language in the "General Notices" section that "[i]n stating the appropriate quantities to be taken for assays and tests, the use of the word 'about' indicates a quantity within 10 percent of the specified weight or volume." (LA000003, USP XXII, at 6; LA000008, USP XXIII, at 8.) However, a person of ordinary skill in the art at the time of the invention would

have understood that this guideline is applicable only to understanding the meaning of "about" as used within the USP.

27. As noted above, the USP standards are not applicable to non-monographed drugs, such as NIASPAN®. Even if the USP were applicable to NIASPAN®—which it is not—the USP is not applicable to the type of test results described in these claim terms.

28. The parameters being measured in the '229 and '715 patents pertain to *in vivo* tests to determine the pharmacokinetic disposition or the way a drug is adsorbed, distributed, metabolized and eliminated (ADME) from the body of an individual. The enforceable standards set out in the USP are not applicable to *in vivo* testing and analysis. Therefore, in my opinion, one of skill in the art at the time of the inventions would never have looked to the USP for a definition of "about" as used to modify these *in vivo* test results.

29. As this case is ongoing, I may supplement the opinions herein at a later date based upon further information provided to me.

I declare under the penalty of perjury that the above is true and correct.

Dated: March 29, 2010

Thomas S. Foster, Pharm.D.



US1DOCS 7494266v1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT LABORATORIES and ABBOTT RESPIRATORY LLC, | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 09-152 (JJF) |
| LUPIN LIMITED and LUPIN PHARMACEUTICALS, INC., | ) | |
| Defendants. | ) | |

**DECLARATION OF JAMES W. MCGINITY, PH.D.,
IN SUPPORT OF PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF**

I, James W. McGinity, submit this declaration in support of the Claim Construction Brief of Abbott Laboratories and Abbott Respiratory LLC (collectively "Abbott").

## I. INTRODUCTION

1. I have been retained by Abbott to provide expert opinions and testimony in the above-captioned case. I understand that Abbott has sued Lupin Limited and Lupin Pharmaceuticals, Inc. (collectively "Lupin") for infringement of U.S. Patent No. 6,080,428 ("the '428 patent"), U.S. Patent No. 6,129,930 ("the '930 patent"), U.S. Patent No. 7,011,848 ("the '848 patent"), U.S. Patent No. 6,406,715 ("the '715 patent"), U.S. Patent No. 6,746,691 ("the '691 patent"), U.S. Patent No. 6,676,967 ("the '967 patent"), and U.S. Patent No. 6,818,229 ("the '229 patent") (collectively, the "Kos Patents"). I have been asked to provide some background regarding drug formulation technology. In addition, I have been asked to comment on the meaning of certain terms in the claims of the Kos Patents from the perspective of one of ordinary skill in the art in the mid-1990s.

range of +/- 15% conflicts with at least one respected monograph for solid dosage forms that describes a degree of variability of only +/- 10%. (*See* AA Ex. 12, U.S. PHARMACOPEIA 24 & NAT'L FORMULARY 19 at 1177 (stating that "Niacin Tablets contain not less than 90.0 percent and not more than 110.0 percent of the labeled amount of [nicotinic acid or niacin]")).

65. The phrase "about __ %" in the '967 and '691 patents relates to the *in vitro* dissolution profiles of the claimed "intermediate release nicotinic acid formulation" and method of treatment using such a formulation. The percentages claimed are derived from *in vitro* dissolution testing, and reflect the amount of nicotinic acid released into solution at specified time points. As I explained in Paragraph 36 above, there is inherent variability in such *in vitro* dissolution testing and in the results produced by such testing. In my opinion, a person of ordinary skill in the art in the mid-1990s would have understood the use of the phrase "about __ %" in the context of the '967 and '691 patents to reflect such variability, and would have interpreted that phrase to mean "approximately __ %."

66. The "about 44" phrase refers to a fit factor that is calculated based on a formula, which uses as inputs the results of *in vitro* dissolution testing. As I explained in Paragraph 34 above, there is inherent variability in such *in vitro* dissolution testing and in the results produced by such testing. In light of such variability, in my opinion, a person of ordinary skill in the art in the mid-1990s would have interpreted the phrase "about 44" in the context of the '967 and '691 patents to mean "approximately 44."

67. I understand that Lupin contends that the use of the language "about __ %" and "about 44" should be interpreted as imposing a strict numerical range of +/- 10%. I disagree. I am not aware of any reference to a particular numerical range for these limitations in either the '967 patent or the '691 patent, and, in my opinion, a person of ordinary skill in the art reading

those patents would not understand that the inventors intended to adopt a numerical range of +/- 10% (or any other specific number) with their use of the phrases "about __ %" and "about 44."

68. As this case is ongoing, I may supplement the opinions expressed herein at a later date based upon further information provided to me.

I declare under the penalty of perjury that the above is true and correct.

Dated: March 1, 2010

James W. McGinity, Ph.D.

REDACTED

UNITED STATE… EPARTMENT OF COMMERCE
Patent and Trademark Office

# NOTICE OF ALLOWANCE AND ISSUE FEE DUE

HM22/0227

PETER J MANSO
AKERMAN, SENTERFITT & EIDSON, P.A.
LAS OLAS CENTRE, SUITE 950
450 EAST LAS OLAS BLVD.
FORT LAUDERDALE FL 33301-2227

| APPLICATION NO. | FILING DATE | TOTAL CLAIMS | EXAMINER AND GROUP ART UNIT | | DATE MAILED |
|---|---|---|---|---|---|
| 08/962,423 | 10/31/97 | 016 | SPEAR, J | 1615 | 02/27/01 |

First Named Applicant: CEFALI, 35 USC 154(b) term ext. = 0 Days.

TITLE OF INVENTION: INTERMEDIATE RELEASE NICOTINIC ACID COMPOSITIONS FOR TREATING HYPERLIPIDEMIA HAVING UNIQUE URINARY METABOLITE PROFILES

| ATTY'S DOCKET NO. | CLASS-SUBCLASS | BATCH NO. | APPLN. TYPE | SMALL ENTITY | FEE DUE | DATE DUE |
|---|---|---|---|---|---|---|
| 1 32892.21 | 424-468.000 | C72 | UTILITY | YES | $620.00 | 05/29/01 |

***THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.***

***THE ISSUE FEE MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED.***

## HOW TO RESPOND TO THIS NOTICE:

I. Review the SMALL ENTITY status shown above.

| If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status: | If the SMALL ENTITY is shown as NO: |
|---|---|
| A. If the status is changed, pay twice the amount of the FEE DUE shown above and notify the Patent and Trademark Office of the change in status, or | A. Pay FEE DUE shown above, or |
| B. If the status is the same, pay the FEE DUE shown above. | B. File verified statement of Small Entity Status before, or with, payment of 1/2 the FEE DUE shown above. |

II. Part B-Issue Fee Transmittal should be completed and returned to the Patent and Trademark Office (PTO) with your ISSUE FEE. Even if the ISSUE FEE has already been paid by charge to deposit account, Part B Issue Fee Transmittal should be completed and returned. If you are charging the ISSUE FEE to your deposit account, section "4b" of Part B-Issue Fee Transmittal should be completed and an extra copy of the form should be submitted.

III. All communications regarding this application must give application number and batch number. Please direct all communications prior to issuance to Box ISSUE FEE unless advised to the contrary.

***IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.***

**PATENT AND TRADEMARK OFFICE COPY**

PTOL-85 (REV. 10-96) Approved for use through 06/30/99. (0651-0033)

| Notice of Allowability | Application No. 08/962,423 | Applicant(s) CEFALI, EUGENIO A. |
|---|---|---|
| | Examiner JAMES M. SPEAR | Group Art Unit 1615 |

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance and Issue Fee Due or other appropriate communication will be mailed in due course.

☒ This communication is responsive to *THE AMENDMENT FILED FEBRUARY 06, 2001* .

☒ The allowed claim(s) is/are *1-16* .

☒ The drawings filed on *Oct 31, 1997* are acceptable.

☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

☐ All ☐ Some* ☐ None of the CERTIFIED copies of the priority documents have been

☐ received.

☐ received in Application No. (Series Code/Serial Number) ________ .

☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

*Certified copies not received: ________ .

☐ Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

A SHORTENED STATUTORY PERIOD FOR RESPONSE to comply with the requirements noted below is set to EXPIRE THREE MONTHS FROM THE "DATE MAILED" of this Office action. Failure to timely comply will result in ABANDONMENT of this application. Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

☐ Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL APPLICATION, PTO-152, which discloses that the oath or declaration is deficient. A SUBSTITUTE OATH OR DECLARATION IS REQUIRED.

☐ Applicant MUST submit NEW FORMAL DRAWINGS

☐ because the originally filed drawings were declared by applicant to be informal.

☐ including changes required by the Notice of Draftsperson's Patent Drawing Review, PTO-948, attached hereto or to Paper No. ____ .

☐ including changes required by the proposed drawing correction filed on ________ , which has been approved by the examiner.

☐ including changes required by the attached Examiner's Amendment/Comment.

**Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the reverse side of the drawings. The drawings should be filed as a separate paper with a transmittal lettter addressed to the Official Draftsperson.**

☐ Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

Any response to this letter should include, in the upper right hand corner, the APPLICATION NUMBER (SERIES CODE/SERIAL NUMBER). If applicant has received a Notice of Allowance and Issue Fee Due, the ISSUE BATCH NUMBER and DATE of the NOTICE OF ALLOWANCE should also be included.

**Attachment(s)**

- ☐ Notice of References Cited, PTO-892
- ☐ Information Disclosure Statement(s), PTO-1449, Paper No(s). ________
- ☐ Notice of Draftsperson's Patent Drawing Review, PTO-948
- ☐ Notice of Informal Patent Application, PTO-152
- ☐ Interview Summary, PTO-413
- ☐ Examiner's Amendment/Comment
- ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material
- ☒ Examiner's Statement of Reasons for Allowance

James M. Spear
**JAMES M. SPEAR**
**PRIMARY EXAMINER**
ART UNIT 1615

The following is an examiner's statement of reasons for allowance:

Applicants show a nicotinic acid formulation for treating hyperlipidemia that is administered once daily resulting in effective control of said hyperlipidemia through the intermediate release of the nicotinic acid. Using nicotinic acid to treat hyperlipidemia is known. O'Neill et al. U.S. 5,268,181 and Bova U.S. 6,080,428 considered the closest prior art of record both show nicotinic acid compositions for treating hyperlipidemia. Both show once daily administration of a nicotinic acid formulation providing prolonged/sustained release. The prior art does not show nor fairly suggest applicant's distinct intermediate release nicotinic acid formulation wherein the combination of nicotinic acid and a swelling agent in a dosage form is administered to an individual and is characterized by an in vitro urinary metabolite profile that is distinct from the prior art. For example when the nicotinic acid formulation is dosed at about 1000 mg nicotinic acid and nicotinuric acid is present in the urine in an amount of from about 4.0% to about 26%, and Pathway 2

metabolites are present in the urine in an amount of from about 74% to about 95%. The formulation effectively treats hyperlipidemia without causing drug-induced hepatotoxicity and elevations in uric acid or glucose or both, to levels which would require use of said intermediate release nicotinic acid formulation to be discontinued.

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

Claims 1-16 are allowed.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to James M. Spear whose telephone number is (703) 308-2457. The examiner can normally be reached on Monday thru Friday from 6:30 A.M. to 3:00 P.M.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Thurman Page, can be reached on (703) 308-2927. The fax phone number for this Group is (703) 305-3592 or 308-4556.

Communications via Internet e-mail regarding this application, other than those under 35 U.S.C. 132 or which otherwise require a signature, may be used by the applicant and should be addressed to [**thurman.page@uspto.gov**].

All Internet e-mail communications will be made of record in the application file. PTO employees do not engage in Internet communications where there exists a possibility that sensitive information could be identified or exchanged unless the record includes a properly signed express waiver of the confidentiality requirements of 35 U.S.C. 122. This is more clearly set forth in the Interim Internet Usage Policy published in the Official Gazette of the Patent and Trademark on February 25, 1997 at 1195 OG 89.

Any inquiry of a general nature or relating to the status of this application or proceeding should be directed to the Group receptionist whose telephone number is (703) 308 1235.

James M. Spear

February 25, 2001

James M. Spear
JAMES M. SPEAR
PRIMARY EXAMINER
ART UNIT 1615

# REDACTED